1  William J. King, Esq. (Bar No. 199908)
   THE WJK LAW FIRM, P.C.
2  1432 Edinger Ave., Suite 200
3  Tustin, CA 92780
   Tel.:  (714) 640-6029
4  Fax:  (714) 640-6843
5  Email:  wking@wjkLawFirm.com

6

7

8

9              **UNITED STATES DISTRICT COURT**

10        **FOR THE EASTERN DISTRICT OF CALIFORNIA -**

11                    **BAKERSFIELD DIVISION**

12

13  NADIA ROBERTS, an individual; SEAN          ) CASE NO.
    ROBERTS, an individual; BERNHARD            )
14  GUBSER, an individual; HEIDI GUBSER,        ) COMPLAINT FOR:
15  an individual; ANTON GINZBURG, an           )
    individual; ARTHUR JOEL EISENBERG,          ) 1.  Fraudulent Misrepresentation and
16  an individual; JEFFREY CHERNICK,            )     Concealment
17  individually and on behalf of SHAMBA, a     ) 2.  Constructive Fraud
    foreign corporation AND SIMBA, a foreign    ) 3.  Negligent Misrepresentation
18  corporation,                                ) 4.  Fraud in Connection with the
                                                )     Purchase or Sale of Securities –
19                                              )     Violations of Section 10(b) of the
                                                )     Exchange Act and Rule 10b-5
20                 Plaintiffs,                   ) 5.  Damages for Sale of Securities by
                                                )     Means of Communications
21                                              )     Containing False Statements and
         v.                                     )     Omissions [Cal. Corp §§ 25401 and
22                                              )     25501]
    UBS AG, a foreign Swiss corporation;        ) 6.  Breach of Fiduciary Duties
23  MICHEL GUIGNARD, an individual;             ) 7.  Violation of U.S.C. § 1962 (c) –
    MARTIN LIECHTI, an individual; RAOUL        )     Federal RICO
24  WEIL, an individual; CHRISTIAN              ) 8.  Violation of 18 U.S.C. § 1962 (d) –
25  BOVAY, an individual; GILBERT BENZ,         )     Federal RICO Conspiracy
                                                ) 9.  Professional Malpractice
26  an individual, ROGER HARTMANN, an           ) 10. Disgorgement of Unethical
    individual; PHILLIP BIGGER an               )     Excessive & Illegal Fees
27  individual, JUERGEN HIRSCH, an              ) 11. Civil Conspiracy
28  individual, KENNY PANG an individual,       ) 12. Unfair Business Practices Act [Cal.
                                                )     Bus. & Prof. Code §17200]
                                                ) 13. Violation of Texas Deceptive
                                                )     Practice Act [Tex. Bus. & Com.
                                                )     Code §§17.41]
                                                ) 14. Deceptive Acts and Practices

                              - 1 -

                            **COMPLAINT**

HANS THOMANN, an individual, )
MARCEL BEELER, an individual, )     Unlawful [N.Y. Gen. Bus. Law §
GILBERT BENZ, an individual, RAOUL )    349].
WEIL, an individual, GERARD )       15. Unfair Business Practices [Rev.
HOFMANN, an individual, CHARLES )        Code. Wash. §19.86.020]
FALK, an individual, CLAUDE ULLMAN, )   16. Breach of Contract
an individual, BJORN MULLI, an )        17. Conversion
individual, GIAN GISLER, an individual, )   18. Breach of Confidentiality
DANIEL PERRON, an individual, BEDA )     19. Accounting
SINGENBERGER, an individual, SINCO )     20. Declaratory Relief
TRULAND AG, a foreign Swiss business )
entity, form unknown, HANSRUEDI )
SCHUMACHER, an individual, )        DEMAND FOR JURY TRIAL
MATTHIAS RICKENBACH, an individual, )
RICKENBACH & PARTNER, a foreign )
Swiss business entity, form unknown, )
GILBERT ZELLWEGER, an individual, )
THE BANK OF N.T. BUTTERFIELD & )
SON LIMITED a foreign Bermuda business )
entity, form unknown, WEGELIN & CO. a )
foreign Swiss limited partnership, DELTA )
INVESTMENT PARTNER AG, a foreign )
Swiss business entity, form unknown, NZB )
NEUE ZURCHER BANK a foreign Swiss )
business entity, form unknown, ZURCHER )
KANTONALBANK, a foreign Swiss )
business entity, form unknown, )
                                    )
              Defendants.           )

## INTRODUCTION

1.     In early 2000, the world's largest investment banking firm, UBS AG, was faced with new IRS requirements that threatened the very existence of U.S.-based business for the Swiss firm. Its response was to hatch and execute a strategy so perfect that it took eight years for the IRS to catch up to it, only to be punished with a meager slap on the wrist.   This meticulously thought out plan involved dozens of board members, directors, and employees and included the cooperation of several third parties

1    located in the United States, Switzerland and Liechtenstein. Left in the wake of the
2    UBS-IRS clash were tens of thousands of U.S. customers many of whom were naïve
3    pawns believing they were acting within the law. The instant group of Plaintiffs falls
4    within this group of pawns.

5        2.    The Defendants' plan was so perfectly thought out that it placed its
6    customers in a position where it would be difficult to seek recourse against the bank once
7    the wheels fell off the bus. Having finally been caught and making several full public
8    confessions of their intent to defraud the U.S. and its customers, it is now time for UBS
9    AG to make its customers whole.

10       3.    UBS AG acted duplicitously as it reported Plaintiffs to the U.S. Treasury as
11   tax violators, in violation of Swiss law. In some instances, UBS AG siphoned money
12   from Plaintiffs as "compensation" for providing false information that these parties were
13   not being investigated by the Department of Justice ("DOJ"). In other instances, UBS
14   AG simply refrained from informing its customers anything at all, waiting until much too
15   late to provide its required notice. Meanwhile, UBS AG wrongfully took control over the
16   Plaintiffs' respective accounts, arbitrarily freezing assets, and advising them that their
17   investments were properly identified for tax purposes or otherwise placed in IRS-
18   compliant vehicles.

19       4.    In truth, UBS AG concealed key information from Plaintiffs, intentionally
20   failing to send proper instructions and tax documents for tax filing purposes, and sending
21   documents in direct contravention to U.S. reporting requirements in accordance with a
22   2001 Qualified Intermediary Agreement UBS AG had signed with the U.S. Government
23   mere months before carrying out its scheme.

24       5.    For Plaintiffs, this scheme robbed them of millions of dollars in unwarranted
25   service fees, legal fees, and inappropriate investments. It also placed them and their
26   family years of tremendous stress, unnecessary criminal investigations, threats of or
27   actual incarceration, audits by the Internal Revenue Service and the DOJ. Further, the
28   scheme has caused each of them to incur millions of dollars in tax penalties, interest and

1    professional fees while forever tarnishing their good names and business reputations. All
2    for what amounted to be mere thousands of dollars in taxes which none of these Plaintiffs
3    had any intention of evading.

4                                **JURISDICTION AND VENUE**

5           6.     This Court has jurisdiction over the subject matter of this action
6    pursuant to 28 U.S.C. §1332(d) because: (a) there is a federal question regarding
7    whether or not Defendants violated Rule 10(b) of the Exchange Act and/or 18 U.S.C. §
8    1962(c) (Civil RICO), (b) the claims of Plaintiffs exceed $75,000.00 and Plaintiffs are
9    diverse from at least one Defendant, and (c) the Court maintains pendent jurisdiction
10   over the state statutory and common law Claims for Relief.  Venue is proper in this
11   District pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise
12   to the claims asserted herein occurred and caused damages in this district.  Additionally,
13   pursuant to F.R.C.P. Rule 20, Plaintiffs may be joined since they assert several claims
14   arising out of the same occurrence and series of occurrences.

15                                    **THE PARTIES**

16          7.     NADIA ROBERTS is, and at all times relevant to this action was, an
17   individual residing in the County of Kern, California.

18          8.     SEAN ROBERTS is, and at all times relevant to this action was, an
19   individual residing in the County of Kern, California.

20          9.     BERNHARD GUBSER is, and at all times relevant to this action
21   was, an individual residing in the State of Texas

22          10.    HEIDI GUBSER is, and at all times relevant to this action was, an
23   individual residing in the State of Texas.

24          11.    ANTON GINZBURG is, and at all times relevant to this action was,
25   an individual residing in the State of New York.

26          12.    ARTHUR JOEL EISENBERG is, and at all times relevant to this
27   action was, an individual residing in the State of Washington.

28

**COMPLAINT**

13.    JEFFREY CHERNICK is, and at all times relevant to this action was, an individual residing in the State of New York.

14.    Plaintiff SHAMBA is and at all times relevant to this action was, a Hong Kong corporation, headquartered and primarily conducting business in the Hong Kong, China.

15.    Plaintiff SIMBA is and at all times relevant to this action was, a Liberia corporation, headquartered and primarily conducting business in the Hong Kong, China ("JEFFREY CHERNICK," "SHAMBA," and "SIMBA" shall sometimes collectively be referred to as "JEFFREY CHERNICK" when referring to property and investment accounts owned by these entities. Such references are made for ease of pleading only and shall not be construed or indicative of any commonality or lack of separateness between the individual and the corporate entity).

16.    Plaintiff is informed and believes and thereon alleges that Defendant UBS AG ("UBS AG") is, and at all relevant times was, a foreign Swiss corporation, and doing business in the United States of America ("U.S.") and within the County of Orange, California.   UBS AG, is a foreign banking and investment firm located in Switzerland, operating worldwide branches including in California, Connecticut, Illinois, New York and Florida.   The California and Florida branches are federally licensed by the Office of the Comptroller of the Currency.   Additionally, the Board of Governors of the Federal Reserve System exercises examination and regulatory authority over UBS AG's state-licensed U.S. branches.   On April 10, 2000, UBS AG was designated a "financial holding company" under the Bank Holding Company Act of 1956.   Such financial holding companies may engage in a broader spectrum of activities, including underwriting and dealing in securities.   Regulations applicable to UBS AG and its subsidiaries impose obligations to maintain appropriate policies, procedures and controls to detect, prevent and report money laundering, terrorist financing and to verify the identity of its customers.   Failure to maintain and implement such adequate programs results in serious consequences for the firm, both legally and in terms of its reputation.

1
2
3
4
5

      17.   UBS AG, UBS Securities LLC and UBS Financial Services, Inc., as well as UBS's other U.S. registered broker-dealer entities are subject to regulations, by the Securities and Exchange Commission, the Financial Industry Regulatory Authority, the New York Stock Exchange, Municipal Securities Rulemaking Board, the U.S. Department of the Treasury, and the Commodities Futures Trading Commission.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

      18.   Defendant UBS AG ("UBS AG") is, and at all relevant times was, a foreign Swiss corporation, and doing business in the United States of America, including New York. UBS AG is a corporation that has its principal offices in Basel and Zurich, Switzerland. UBS AG is a global financial services company, and is registered as a public corporation in the United States with the New York Stock Exchange ("NYSE"). UBS AG offers banking, securities, trading, brokerage and related products, and Wealth Management services. Additionally, the Board of Governors of the Federal Reserve System exercises examination and regulatory authority over UBS AG's state-licensed U.S. branches. On April 10, 2000, UBS AG was designated a "financial holding company" under the Bank Holding Company Act of 1956. Such financial holding companies may engage in a broader spectrum of activities, including underwriting and dealing in securities. Regulations applicable to UBS AG and its subsidiaries impose obligations to maintain appropriate policies, procedures and controls to detect, prevent and report money laundering, terrorist financing and to verify the identity of its customers. Failure to maintain and implement such adequate programs results in serious consequences for the firm, both legally and in terms of its reputation.

22
23
24
25
26
27
28

      19.   Defendant Phillip Bigger ("Bigger") upon information and belief, is, and at all relevant time was, a citizen of Switzerland and was an agent of Swiss Bank Corporation ("SBC") throughout the 1990s and thereafter for UBS AG as an Executive Director of North America handling accounts with $50,000,000 or more for UBS AG requiring travel and the conducting of business to New York and the U.S., including business conducted with Plaintiffs, from at least 1998 through July 2008. It is further believed that Bigger is currently assigned to UBS AG's Mexico office.

1

2

3

4

      20.   Defendant Juergen Hirsch ("Hirsch"), upon information and belief, is, and at all relevant time was, a citizen of an unknown country and was an agent of UBS Hong Kong as an account advisor whose specific title is unknown.   Hirsch conducted business with U.S. clients, including Plaintiffs, from 2002 through 2006.

5

6

7

8

      21.   Defendant Kenny Pang ("Pang"), upon information and belief, is, and at all relevant time was, citizen of Hong Kong and acted as an agent of UBS Hong Kong as a financial advisor who conducted business with U.S. clients, including Plaintiffs, around the year 2004.

9

10

11

12

13

14

15

16

17

18

      22.   Defendant Hans Thomann ("Thomann"), upon information and belief, is, and at all relevant time was, a citizen of Switzerland and was an agent of UBS AG as a account advisor/executive director whose specific title is unknown and whose business required travel to the U.S. to meet with clients, including Plaintiffs, from at least 2000 through approximately 2004 whereupon Thomann became an agent of Delta Investment Partner AG ("Delta").   Thomann worked as a financial advisor at Delta. Thomann's specific title is unknown, but, upon information and belief, he served as an investment advisor and traveled to New York and the U.S. in order to advise clients, including Plaintiffs, concerning investments from approximately 2005 until at least December 31, 2008.

19

20

21

22

23

      23.   Defendant Marcel Beeler ("Beeler"), upon information and belief, is, and at all relevant time was, a citizen of Switzerland and was an agent of UBS AG as a financial advisor whose specific title is unknown and whose business required travel to New York and the U.S. to meet with clients, including Plaintiffs, from at least 2003 through approximately 2004.

24

25

26

27

      24.   Defendant Gilbert Benz ("Benz"), upon information and belief, is, and at all relevant time was, a citizen of an unknown country and was an agent of UBS AG as a Executive Director and whose business was conducted through travel to New York and the U.S. to meet clients, including Plaintiffs, in either 2003 or 2004.

28

1          25.    Defendant Raoul Weil ("Weil"), upon information and belief, is, and

2  at all relevant times was, a citizen of an unknown country and the Chairman and CEO of

3  UBS AG's Global Wealth Management & Business Banking Division, who conducted

4  business in the U.S.

5          26.    Defendant Björn Mülli ("Mülli"), upon information and belief, is,

6  and at all relevant times was, a citizen of unknown country and banker employed by

7  UBS AG's Global Wealth Management & Business Banking Division, who conducted

8  business in the U.S.

9          27.    Defendant Gerard Hofmann ("Hofmann"), upon information and

10  belief, is, and at all relevant times was, a citizen of unknown country and banker

11  employed by UBS AG's Global Wealth Management & Business Banking Division,

12  who conducted business in the U.S.

13          28.    Defendant Charles ("Faulk"), upon information and belief, is, and at

14  all relevant times was, a citizen of unknown country and banker employed by UBS AG's

15  Global Wealth Management & Business Banking Division, who conducted business in

16  the U.S.

17          29.    Defendant Claude Ullman ("Ullman"), upon information and belief,

18  is, and at all relevant times was, a citizen of unknown country and banker employed by

19  UBS AG's Global Wealth Management & Business Banking Division, who conducted

20  business in the U.S.

21          30.    Defendant Gian Gisler ("Gisler"), upon information and belief, is,

22  and at all relevant times was, a citizen of unknown country and banker employed by

23  UBS AG's Global Wealth Management & Business Banking Division, who conducted

24  business in the U.S.

25          31.    Defendant Daniel Perron ("Perron"), upon information and belief, is,

26  and at all relevant times was, a citizen of unknown country and Director of UBS AG's

27  Global Wealth Management & Business Banking Division, who conducted business in

28  the U.S.

32.     Defendant Beda Singenberger ("Singenberger"), upon information and belief, is, and at all relevant times was, a citizen of unknown country and owner of Sinco Truland AG, who conducted a legal services business in the U.S. vis-à-vis engagement by UBS AG to set up third party trusts.

33.     Defendant Hansruedi Schumacher ("Schumacher"), upon information and belief is, and at all relevant time was, a citizen of Switzerland, and from the late 1990s through mid-2002 an agent of UBS AG as a Regional Market Manger for UBS's North America International business including U.S. cross-border business.   In this capacity Schumacher was required to travel to the U.S. to meet clients, including Plaintiffs.  In mid-2002 Schumacher became an agent of Defendant NZB Neue Zurcher Bank as a private banker and executive manager and traveled to New York and the U.S. to meet with clients, including Plaintiffs, to conduct business from mid-2002 through at least July 2009. Currently, Schumacher has been declared as a fugitive from justice as a result of his flight and evasion of U.S. authorities in connection with criminal prosecution initiated as a consequence of his involvement in the events described below.

34.     Defendants' Bigger, Pang, Thomann, Hirsch, Beeler, Benz, Rickenbach, Weil, Hofman, Falk, Ullman, Mulli, Sinco Truland AG, Gisler, Perron, Singenberger, and Schumacher are hereinafter referred to collectively as the "UBS AG Defendants."

35.     Defendant Matthias W. Rickenbach ("Rickenbach") upon information and belief, is, and at all relevant times was, a citizen of Switzerland and a partner of Rickenbach Firm.   Upon information and belief, Rickenback received a masters degree in tax law from the University of San Diego in 1999 and had a contract to provide legal advice to UBS and NZB Neue Zurcher Bank, The Bank of N.T. Butterfield & Son Limited, and Delta Investment Partner AG clients, including Plaintiffs, through office visits in Switzerland and travels to New York and the U.S., concerning the setting up of trusts and fictitious corporate "sham" entities in addition to providing tax advice. Currently, Rickenbach has been declared a fugitive from justice as a result of his flight

1   and evasion of U.S. authorities in connection with criminal prosecution initiated as a
2   consequence of his involvement in the events described below.

3         36.    Defendant Rickenbach & Partner ("Rickenbach Firm"), upon
4   information and belief, is, and at all relevant times was, a Switzerland corporate entity
5   located in Zurich and was a law firm that advised clients, including Plaintiffs, on matters
6   including trusts and estates and Swiss and U.S. tax law.  From 2002 until approximately
7   2007 Rickenbach Firm sent at least one agent into New York and the U.S. to conduct its
8   law practice in connection to its business arrangements with Defendants UBS AG and
9   NZB Neue Zurcher Bank.

10        37.    Defendant Gilbert Zellweger ("Zellweger"), upon information and
11  belief, is, and at all relevant times was, a citizen of an unknown country and was an agent
12  of Schumacher, a former UBS AG employee, and may have been an employee of NZB
13  under Schumacher.  Zellweger used Julius Bear as his clients' clearing agent.  Zellweger
14  solicited investments in Swiss accounts from U.S. citizens.

15        38.    Defendant The Bank of N.T. Butterfield & Son Limited
16  ("Butterfield") is a publicly traded Bermuda Corporation with shares listed on the
17  Bermuda and Cayman Island exchanges and conducted business with customers in the
18  U.S., including Plaintiffs.  Butterfield is a full service community bank and a provider of
19  specialized international financial services encompassing retail, corporate banking, and
20  treasury activities.  In the wealth management area, Butterfield provides private banking,
21  asset management, and personal trust services from its headquarters in Bermuda and
22  subsidiary offices in The Bahamas, the Cayman Islands, Guernsey, Switzerland and the
23  United Kingdom.

24        39.    Defendants' Butterfield, Rickenbach, and Schumacher are hereinafter
25  referred to collectively as the "Butterfield Defendants."

26        40.    Defendant Wegelin & Co. ("Wegelin") is a foreign Switzerland
27  limited partnership that conducted business with clients in the U.S., including Plaintiffs.

28

1  Wegelin specializes in developing customized wealth management and retirement
2  planning solutions for clients.

3        41. Defendant Delta is a foreign Switzerland entity, form unknown, that
4  provides investment advisory services for clients and conducts business for U.S. clients,
5  including Plaintiffs.

6        42. Defendants' Thomann, Wegelin, and Delta Investment, are
7  hereinafter referred to collectively as the "Wegelin Defendants."

8        43. Defendant NZB Neue Zurcher Bank ("NZB") is a foreign
9  Switzerland private bank, form unknown, established in 2000 by three bankers formerly
10  employees of Bank Julius Baer. In 2001, NZB became a member of the Swiss stock
11  exchange. NZB conducts business in the U.S. by sending its agents to New York and
12  the U.S. and soliciting business from U.S. citizens.

13        44. Defendant Zurcher Kantonalbank ("Kantonalbank") is a foreign
14  Switzerland private bank, form unknown, and is the largest cantonal bank and leading
15  financial services provider in the greater Kantonalbank area. Kantonalbank conducts
16  business in the U.S. by holding account assets of U.S. clients, including Plaintiffs, at the
17  bank.

18        45. Defendants' Rickenbach, Schumacher, Zellweger, and Kantonalbank,
19  are hereinafter referred to collectively as the "NZB Defendants."

20        46. Plaintiff is unaware of the true names, capacities, or basis for liability
21  of defendants DOES 1 through 10, inclusive, and therefore sues said defendants by their
22  fictitious names. Plaintiff will amend this complaint to allege their true names,
23  capacities, or basis for liability when the same has been ascertained. Plaintiff is
24  informed and believes and thereon alleges that defendants, DOES 1 through 10,
25  inclusive, and each of them, are in some manner liable to plaintiff. Plaintiff is entitled to
26  name DOE defendants pending discovery to identify additional defendants connected
27  with the already-identified corporation defendants. (*Johnson v. City of Erie,*
28  *Pennsylvania*, 834 F. Supp. 873 (W.D.Pa.1993) and *Wilkins v. Bittenbender*, 2006 WL

1 │ 860140.)  Indeed, diversity jurisdiction is already established based on the residences of

2 │ already-identified defendants, hereinabove, and as set forth herein below.  Moreover,

3 │ federal question jurisdiction exists as more fully detailed in Paragraph 3, *supra*.

## FACTUAL STATEMENT

### UBS AG's Scheme

6 │     47.    In the years prior to January 2001, the United States Treasury Department

7 │ estimated that it lost billions of dollars in taxes owed by U.S. citizens from their

8 │ overseas investments.  To end this practice, the U.S. Treasury advised foreign banks,

9 │ such as UBS AG and others, that if they wished to continue conducting business in the

10 │ U.S. with its citizens, it would be required to enter into what became known as the

11 │ Qualified Intermediary ("QI") Agreement.

12 │     48.    Under the QI Agreement, UBS AG was required to agree to have UBS AG

13 │ customers complete IRS Forms W-8BEN or W-9, both of which required the beneficial

14 │ owner of any accounts to be identified on the form if they believed or knew that person

15 │ to be a U.S. citizen or resident.  If a U.S. client was deemed by UBS AG to have

16 │ "refused" QI Agreement identification, UBS AG purported to agree to withhold and pay

17 │ over to the U.S. Treasury a twenty-eight percent (28%) withholding tax on U.S. source

18 │ payments and then bar the client from holding U.S. investments.  Additionally, the sales

19 │ proceeds, interest and dividends earned on non-U.S. investments, if the purchase or sale

20 │ of the investment was made as a result of contact (in person, via email, telephone or

21 │ facsimile) with a U.S. client in the U.S., was subject to the Bank issuing IRS Form 1099

22 │ reporting requirements or twenty-eight percent (28%) withholding.

23 │     49.    Since compliance with the QI requirements would result in the elimination

24 │ of the bank's and Switzerland's well-known account secrecy, requiring taxation of its

25 │ U.S. based customers would result in a significant reduction in the investment returns for

26 │ its U.S. clients.  Without being able to offer greater returns on investments, UBS AG

27 │ feared its U.S. clients would invest in U.S. based banks and would the bank would suffer

28 │ from the reduction in wealthy individuals holding accounts with UBS AG's investment

1   management services.  In turn, the reduction in wealth client accounts would cause UBS
2   AG to suffer a tremendous blow to its bottom line as well as a blow to the compensation
3   to its executives and directors.

4        50.   In response to this impending death knell, UBS AG's board and executives
5   met in 1999 and 2000 to strategize how to best respond to the U.S.'s pressure.  In
6   approximately late 1999, the decision was made to act with duplicity toward the IRS and
7   U.S. wealthy customers.  Specifically, UBS AG would inform the IRS that it would
8   agree to the QI Agreement terms while devising a scheme to avoid doing just that.

9        51.   As it would turn out, depending on the source of invested funds, UBS AG
10  had an action plan to manipulate its U.S. customers such that UBS AG would avoid its
11  own compliance with the QI Agreement while also misleading its customers regarding
12  taxes and reporting responsibilities, as follows:

13           a. UBS AG advised the use of third party trust entities, did not comply
14                with   its   advisement-disclosure-withholding   duties   under   the   QI
15                Agreement; and

16           b. UBS AG encouraged inherited offshore accounts to remain in said
17                offshore accounts and concealed the QI Agreement requirements.

18  UBS went so far as to advise its clients that taxes were not required to be paid
19  unless and until a client brought its money into the U.S., or otherwise repatriated it.

20       52.   UBS  AG  contracted  professional  service  companies,  such  as  the
21  Rickenbach Firm, and "Financial Intermediaries" (referred to by UBS as "FIMs") to
22  create the appearance of legality and independent recommendation and counsel in order
23  to perpetrate their unlawful scheme to avoid the terms of the QI Agreement. UBS AG's
24  scheme  ultimately  exposed  its  U.S. clients,  including  each  Plaintiff,  to  criminal
25  investigation, felony charges, imprisonment, unnecessary tax and FBAR penalties, back
26  payment fees, emotional distress, and loss of business reputation.

27       53.   Following the aforementioned 1999-2000 board meetings, UBS AG made a
28  company-wide statement to its wealth management executives that it was committed to

providing secret private banking services to U.S. citizens notwithstanding the QI Agreement and in direct contravention of the agreement.  UBS AG and UBS AG Defendants continued to reinforce the message that their private wealth management executives had directed them to, and did, deliver to their U.S. clients, including each Plaintiff, was that said customers would continue to enjoy their respective privacy and secrecy citing Swiss Law and the bank's relationship with the IRS.

54.   As admitted by UBS AG, its directors and management established written policies and guidelines to effectuate the scheme in an effort to gain additional U.S. clients and investments under the fraudulent promises of lawful tax planning strategies.

55.   UBS AG's actions and promises were not lawful as the UBS AG Defendants and co-conspirators had presented them to be to U.S. clients, including each Plaintiff.  Due to UBS AG's sheer size, purported expertise and respectable worldwide position, the firm was able to manipulate its clients, including Plaintiffs.  UBS AG Defendants were eager to grow this business and revenue stream from wealthy U.S. citizens at any expense, including through unlawful and fraudulent means and methods.

56.   Accordingly, UBS AG directly authorized and encouraged UBS AG Defendants, and other wealth management executives to regularly travel to the U.S. to solicit new clients and solicit the sale of securities while conducting banking for existing U.S. clients. Moreover, UBS AG sponsored formal dinners and seminars, visiting art shows, sailing regattas, and other such events to facilitate contact with wealthy citizens and instruct them in means for transferring assets undetected by the IRS and other U.S. tax agencies. UBS AG trained its executive bankers in techniques to avoid questioning by U.S. law enforcement by falsely stating their purpose of travel to be recreational rather than business on U.S. Customs entry forms. Additionally, UBS AG instructed agents to travel quietly and to not be tracked by authorities while in the U.S. Upon information and belief, UBS AG trained its agents to conceal and transfer clients' account funds and assets overseas without detection. UBS AG and UBS AG Defendants also trained their agents how to present to, and swindle, prospective and existing clients

into believing that UBS AG's careful advice and account handling was legal and within IRS regulations. UBS AG's management, Board of Directors and others, were aware of, encouraged, directed, authorized and commanded UBS AG employees, including UBS AG Defendants to execute their fraudulent and unlawful scheme against U.S. citizens, including each Plaintiff.

57.    For the purposes of specifying some of UBS AG's, UBS AG Defendants', and UBS AG directors and management unlawful policies and guidelines, the following are examples of documents created by UBS AG designed to defraud Plaintiffs and U.S. authorities:

    a. In a document entitled "Review of US Resident Non-W9 Business Legal and Compliance" dated December 10, 2004, authored by J Watson and Franz Zimmermann and published by UBS AG Wealth Management & Business Bank, Risk and Compliance division, UBS AG addresses the risks due to UBS AG's violation of the QI agreement in the handling of U.S. accounts. Specifically the document examines the firm's failure to provide W-9 information for U.S. account holders.   Key findings include:

        i. "The number of account relationships in [UBS Wealth Management and Business Banking "WM&BB"] in Switzerland with US residents where the account holder has not provided a W-9 is approximately 52,000 (representing CHF 17 billion in assets)."

        ii. "UBS AG, Switzerland, is not licensed to conduct regulated activities within the US.   The primary risk facing WM&BB therefore in dealing with US Residents generally (whether or not W9s), is that we are alleged by the SEC to have carried on securities related activities within the US for US persons against SEC regulation.   Specifically this is the risk that WM&BB has

communicated within or into the US to US Persons regarding securities."

   iii. Actions taken by UBS to limit detection risk include efforts to ensure that UBS does "not enter into postal or e-mail communication into the US regarding the portfolios"; "increase the number of relationships that require no (or little) communication into the US"; and creating guidelines and training materials for Client Advisors "indicating the limits of what they can do with respect to communicating into the US".

   iv. "In the last year, we are advised that 32 different Client Advisors from BS NAM have traveled to the US on business. On average, each Client Advisor visited the US for 30 days per year, seeing 4 clients per day. This means that approximately 3,800 clients are visited in the US per year by WM&BB Client Advisors based in Switzerland."

b. In a document entitled "US crossborder business model/QI: Sales deemed to be affected in the United States" dated January 9, 2002 and published by UBS AG Legal & Compliance International division to UBS directors and managers, including Schumacher, authored by Franz Zimmermann, UBS discusses its compliance procedures under the QI and lays out proposals for circumventing the QI Agreement. These proposals reveal:

   i. UBS AG had no intention of being QI compliant believing that the firm "has 'only' to be in substantial compliance with the QI rules to receive a positive audit rating."

   ii. UBS AG intended to circumvent the QI by *automatically transferring* client accounts to discretionary accounts.

  c. In a document entitled "Cross-Border Business Training Workshop North America 2004" dated September 20, 2004, and published by UBS AG Wealth Management authored by Franz Zimmermann, UBS trains its Client Advisors how to circumvent U.S. law.  UBS AG trained its agents to avoid U.S. law by:

    i. Training its agents to avoid U.S. laws and likening the endeavor to fighting on a regulatory "Battle Field."

    ii. Implementing a "ringfencing model" that could be used to avoid the SEC's definition of a sale of securities in the U.S.

  d. In a document entitled "US Training Sessions – US International NAM" dated September 25, 2006, and published by UBS AG, UBS AG trains its Client Advisors how to behave and interact with clients when traveling to the US.  UBS AG trained its agents to avoid U.S. law by:

    i. Increasing "ring-fenced discretionary solutions" by switching clients into discretionary accounts

    ii. Creating guidelines to provide false and misleading information to U.S. boarder agents about the purposes of the advisor's travels to the U.S.

    iii. Altering travel habits and flight routines in order to avoid patterns and detection.  UBS made a "strong recommendation to change hotels in rotation" in order to avoid U.S. detection.

  58. Further, UBS AG Defendants knew that they themselves, their executives, and agents were not properly licensed to provide banking services, offer tax and investment advice, manage funds and/or solicit the purchase or sale of securities to U.S. citizens and/or soliciting unregistered securities and that its actions in soliciting and servicing U.S. clients, including Plaintiffs, were in violation of U.S. securities laws. UBS's foreign employees appear to have deliberately defied their obligations to register themselves and the securities offered with the federal and state regulators and/or become

a member of FINRA, as required under federal law because they recognized that such registration would subject UBS AG and UBS AG Defendants to detailed record-keeping, examination, and reporting requirements, something that would prove problematic for UBS AG's illegal and covert operations and continuing to avoid disclosing its clients' identities to the Internal Revenue Service; the same reporting that UBS AG specifically instructed Plaintiffs that they were exempt from complying with under UBS AG's investment model. While engaging in secret brokerage and investment advisory services, UBS AG and its co-conspirators continued to feign compliance with the IRS and the QI Agreement, but failed to disclose this illegal activity to Plaintiffs or any of its other U.S. clients.

59.   In the furtherance of UBS AG and UBS AG Defendants' illegal scheme, the firm took precautions to avoid liability should it one day be the subject of a criminal investigation and understood as early as 2003 that "immediate action is required in order to build up a defense against a possible future criminal case against the bank."  Rather than cease their illegal activities, disclose to clients their requirements under the QI and advise their clients appropriately in accordance with U.S. law, UBS AG and UBS AG Defendants schemed to conceal their activities and counter that any suit or IRS action contained information that is being made "up about the bank."  *Id.*  Thus, UBS AG, and UBS AG Defendants not only schemed to defraud U.S. authorities and solicited, offered, and induced U.S. clients to conceal offshore assets but UBS AG also anticipated and planned to retaliate against their own clients by creating or positing evidence contrary to the truth should UBS AG clients come forward to the IRS once discovered.

60.   As such, UBS AG, UBS AG Defendants, directors, and management intentionally or recklessly --or in the alternative, was at least negligent or unreasonable in not knowing-- solicited, offered, and induced U.S. clients, including Plaintiffs, to conceal offshore assets from the U.S. Government using a variety of means, disguises, schemes, tactics, and covers, engaged in unlawful trading of U.S. securities, which each Plaintiff reasonably relied upon to their own legal and financial detriment.

61.     Further, the UBS AG Defendants knew that their executives and agents were not properly licensed to provide banking services, offer tax and investment advice, manage funds and/or solicit the purchase or sale of securities to U.S. citizens and that its actions in soliciting and servicing U.S. clients, including Plaintiff, were in violation of 15 U.S.C. §§ 78o(a) and 80b-3(a)[1] and California Corp. Code §25004(a)(4).  UBS's foreign employees appear to have deliberately defied their obligations to register with the federal and state regulators and/or become a member of FINRA, as required under federal law because they recognized that such registration would subject UBS and such employees to detailed record-keeping, examination, and reporting requirements, something that would prove problematic for UBS if it wanted to avoid disclosing its clients' identities to the Internal Revenue Service; the same reporting that UBS specifically instructed each Plaintiff he was exempt from complying with under their investment model.  While engaging in the secret brokerage and investment advisory services, UBS continued to feign compliance with the IRS QI Agreement, but failed to disclose this illegal activity to Plaintiffs or any of its clients.  This, as described below, constituted a material omission in violation of the federal securities anti-fraud statute.

62.     Indeed, in or around November 6, 2008, the DOJ filed an indictment against UBS AG Chief Executive Officer Raoul Weil for his active role in the above-described activities.  The indictment further identifies a multitude of involved, but yet-to-be-named executives, managers, "desk heads," and bankers and corroborates Plaintiffs' allegations.  The indictment further notes that these personnel maintained positions on committees that oversaw legal, compliance, tax, risk, and regulatory issues related to the United States cross-border business.  It further notes that the reporting chain traveled from the bankers to the desk heads to the managers to the executives, including Defendant Weil.  Notwithstanding the anonymous code terms used by the DOJ, Defendants Guignard, Liechti, Bovay, and Benz, each served in the functions of executive, manager, and/or

---

[1] Secs. 15(a) of the Securities Exchange Act of 1934 and 203(a) of the Investment Advisers Act of 1940.

**COMPLAINT**

1   desk head as described by the DOJ in the indictment in their management and handling
2   of Plaintiffs' assets.

3   **The Scheme Executed Against Each Plaintiff:**

4   **NADIA AND SEAN ROBERTS:**

5   63.   NADIA and SEAN ROBERTS are a married couple.  In or around 2004,
6   SEAN ROBERTS owned a UBS account in the Isle of Mann.  Claude Ullman was the
7   UBS AG banker who communicated with SEAN ROBERTS and convinced him to
8   transfer his account to UBS AG's Switzerland location.  Master Account No. 0206-
9   P0056602 was then created.

10   64.   SEAN ROBERTS was also introduced to Beda Singenberger at Sinco
11   Truland AG.  As with at least one other Plaintiff herein, Singenberger was hired by UBS
12   AG to set up a trust for SEAN ROBERTS.  Singenberger created a third party trust for
13   SEAN ROBERTS's benefit; however, at no time did UBS AG, Singenberger, or any of
14   their co-conspirators advise plaintiffs of the illegal nature of said third party trust and/or
15   plaintiffs' reporting requirements.

16   65.   Between 2004 and 2009, NADIA and SEAN ROBERTS were also
17   contacted and visited regularly in Kern County, California by Charles Falk, another UBS
18   AG representative.  Falk would provide statements and otherwise discuss said plaintiffs'
19   accounts.

20   66.   At no time were they advised of the QI Agreement or its terms contained
21   therein.  At the time UBS AG was striking a deal with the U.S. to release names, UBS
22   AG and its co-conspirators failed to even advise plaintiffs that their accounts were set up
23   in violation of the QI Agreement and that said plaintiffs needed to take steps to advise the
24   IRS and mitigate their damages.  In fact, UBS AG sent information about said plaintiffs
25   to the IRS in or around February 2009; however, it did not send an amnesty letter to
26   plaintiffs until *ten* months later in November 2009.

27   67.   Based on the foregoing, said plaintiffs suffered in excess of $3.5 Million in
28   penalties for which they should not have incurred, but for UBS AG's fraud and breach of

1  fiduciary duty.   NADIA and SEAN ROBERTS also suffered personal and business
2  reputation damages related to their test pilot school and their relationship with the FAA.

4  **BERNHARD AND HEIDI GUBSER:**

5  68.   BERNHARD and HEIDI GUBSER are two individuals who were married
6  between 1978 and 2008.   In the early 1970s, plaintiffs held a UBS AG Master Account
7  No. 0252-00556738.   The parties earned and/or inherited money, which is the subject of
8  this claim, prior to 1982 when they moved to the U.S. from Switzerland.   Over the years,
9  they occasionally deposited after-tax money, but the bulk of the account was deposited
10  while they were Swiss citizens.   They did manage the account, but rather allowed the
11  account to simply sit there.   They did not even become U.S. citizens until 1992 and
12  always intended on retiring in Switzerland.

13  69.   After the QI Agreement was entered into, Gerard Hofmann served as the
14  UBS AG representative who serviced said plaintiffs. Hofmann has since left UBS AG as
15  of 2008.

16  70.   Between approximately 2000 and 2004, while working for UBS AG and
17  during his rounds in the U.S., Hofmann visited BERNHARD and HEIDI GUBSER on
18  multiple occasions in San Antonio, Texas to discuss the account and provide plaintiffs
19  with account statements.

20  71.   The account eventually reached close to $5.5 Million.   At no time did
21  anyone at UBS AG ever advise BERNHARD and HEIDI GUBSER that they were
22  subject to the QI Agreement and its terms contained therein.   Unfortunately, said
23  plaintiffs' account experienced income growth each year between 2004 and 2009.

24  72.   In or around December 2010, said plaintiffs realized that they may be
25  subject to the prosecution by the IRS for failing to declare a 40-year old account
26  originating in Switzerland.   Plaintiffs have been damaged in excess of $2.75 Million
27  combined.

28

**ANTON GINZBURG:**

73.    Ginzburg is a Medical Professional.  Concerned about frivolous malpractice lawsuits he consulted a UBS AG banker in New York, Mr. Felix Kuntsman, regarding asset protection in early 1994. He was advised by Mr. Kuntsman to deposit his funds in a UBS AG overseas account. Relying on Kuntsman's expertise and UBS AG's reputation, GINZBURG did so.  He was assured that this is the most common way of asset protection and Mr. Kuntsman's exact purpose of visiting US regularly was to meet with the potential clients US clients needing asset protection.  He advised Ginzburg that although other banks in New York were providing similar services, UBS AG was the biggest and the most reliable of them all.

74.    In or around 2000, UBS AG banker Gian Gisler replaced Kuntsman as his bank representative. Gisler advised Ginzburg that he needed to change the structure in which his funds were held and introduced plaintiff to Mr. Matthias Rickenbach at the recommendation of UBS's legal department. Ginzburg attended a meeting with Gisler, UBS Director Daniel Perron, and Rickenbach.  These bank representatives then advised Ginzburg to close a Liechtenstein-based trust structure they had previously recommended back in 1998 and to open a Hong Kong-based trust.  They assured him that opening a foreign "trust account" was the most common asset protection strategy under US constitution based on British law.  Moreover, they advised him that he "would not have to pay any taxes on any capital gains or dividends until the funds were repatriated" to Plaintiff's country of future domicile as Plaintiff possesses dual citizenship. Ginzburg was advised that he would only have to pay the taxes on any possible capital gains or dividends of the country – U.S. or Israel—where he would ultimately repatriate the funds. Upon Ginzburg's further inquiry to confirm this, UBS AG advised Plaintiff that it had a great understanding of the US Tax code.  Further, Rickenbach was presented as a licensed US Attorney specializing in setting up trusts. Ginzburg was assured that numerous such trusts were set up by Richenbach at the bank's recommendation and the bankers unanimously vouched for Richenbach's professional

1  integrity.  Trusting in these representations, Ginzburg allowed Rickenbach to set up the
2  recommended trust at UBS AG's repeated strong recommendations.

3      75.    Ginzburg was not an active investor. Instead, he allowed his money to sit in
4  simple stock accounts.  He would regularly have telephone and in-person conferences
5  with Gisler who would frequently visit him and dozens of other similar clients in New
6  York and Boston to provide them with UBS AG account statements and stock market
7  research.  Rickenbach had also visited Ginzburg in New York in or around 2007 as a
8  purported "checkup."

9      76.    Ginzburg was never informed of the 2001 QI Agreement, or its terms
10 contained therein.  Indeed, his account was invested in U.S. stocks despite UBS AG's
11 knowledge and agreement with U.S. Authorities to comply with one of the protocols
12 pertaining to a W-8BEN form or withholding.

13     77.    Then, in or around November 2008, Ginzburg was advised by Gisler that
14 his accounts were being arbitrarily and wrongfully frozen by UBS which prevented him
15 from mitigating his losses, during a downturn in the market, resulting in more than a $1
16 Million loss. In all, Plaintiff's monetary losses are in excess of $4.5 Million.

17     83. In or around December 2008, a new UBS AG representative, Patrick
18 Hoffmann, was placed in charge of Ginzburg's account.  Over the next few months,
19 Ginzburg, outraged by the lawlessness perpetrated on him by the bank, pressured UBS
20 AG representatives for all bank records necessary to file a voluntary disclosure with the
21 U.S. Authorities as per Plaintiff's US Attorney's Advice. No assistance was furnished to
22 Ginzburg as all bank representatives were reluctant to provide any information or
23 documents uncertain of their own legal standing in view of US Authority's pressure. In
24 the interim, Bank representatives have refused to give out any information about
25 Plaintiff's funds.  Yet, without any notice to the Plaintiff, or Plaintiff's authorization, the
26 Bank had forcefully liquidated the stock portfolio at 2009 market levels causing 1.5
27 million dollars loss.  In addition, despite of losses in portfolio, a "sales tax" in the amount
28 of $565,000.00 was withheld without any benefit to the plaintiff.

**COMPLAINT**

1    **ARTHUR JOEL EISENBERG:**

2        78.    ARTHUR JOEL EISENBERG held a UBS account in the Grand Caymans

3    which he opened decades ago.  By chance, during a vacation, he entered the bank to

4    inquire about an account he thought he had there when he was informed that it was on

5    the "abandoned accounts" list and was transferred to UBS AG n Switzerland.

6        79.    Upon traveling to Zurich, Switzerland to confirm the account was indeed

7    his, ARTHUR JOEL EISENBERG was introduced to Hansruedi Schumacher who

8    suggested ARTHUR JOEL EISENBERG set up a trust account, seemingly for purposes

9    of avoiding the QI Agreement.  Unwittingly, ARTHUR JOEL EISENBERG permitted

10   Schumacher to set up the account in a Liechtenstein trust.

11       80.    This account was never actively managed and held no U.S. securities.  Yet,

12   ARTHUR JOEL EISENBERG was still visited monthly in Seattle, King County, State

13   of Washington, by UBS AG's Björn Mülli who provided ARTHUR JOEL EISENBERG

14   with his account statements during these visits.  Moreover, UBS AG was wrongfully

15   double-charging its account fees during the entire tenure of the account.

16       81.    At no time was ARTHUR JOEL EISENBERG ever advised of the QI

17   Agreement or his requirement to report his account for tax purposes.

18       82.    Moreover, despite its dealings with the U.S. in disclosing names of U.S.

19   clients, UBS AG failed to provide ARTHUR JOEL EISENBERG with any notice that it

20   would be releasing his name to the U.S., thereby depriving him of the opportunity to

21   correct any defects, file for voluntary disclosure, or otherwise appeal the disclosure of

22   his name which would have put his reputation at unwarranted risk.  This disclosure

23   violated UBS AG's own stated elements for proper disclosure and further violated Swiss

24   Laws regarding confidentiality.

25       83.    Consequently, ARTHUR JOEL EISENBERG's name was released with the

26   first 450 names given to the IRS and he was prosecuted and forced to pay tremendous

27   penalties -$2.5 Million-- for what amounted to be an approximate $65,000 tax bill.

28

**JEFFREY CHERNICK:**

84.    JEFFREY CHERNICK has worked his entire life in the toy business and succeeded in becoming a prominent businessman in the toy industry.  After City College and working in retail products sales, JEFFREY CHERNICK started his products business in Hong Kong in the 1970's, eventually opening a products manufacturing company called SHAMBA in 1981.  JEFFREY CHERNICK is an extremely hard worker who runs his company without employees and grew the company to over $30 million in revenue per year.  JEFFREY CHERNICK's products company is also the largest supplier of toys to several prominent retailers.

85.    JEFFREY CHERNICK sought to collect the profits from his Hong Kong products business in overseas accounts and invest the profits prudently to safely manage and grow assets from accumulated wealth from his successful products business. JEFFREY CHERNICK did not seek risky or speculative investments or to violate U.S. tax law.  JEFFREY CHERNICK's products business and SHAMBA were legitimate overseas operations not setup in order to defraud the U.S. government.  The scheme to use JEFFREY CHERNICK and SHAMBA's accounts to conduct illegal securities trading and defraud the U.S. government was originated, planned, executed, and caused by UBS AG, UBS AG Defendants, and Schumacher under the false representations made to JEFFREY CHERNICK that the corporate structures and tax deferral used legal means.

86.    In 2000, Bigger recommended that JEFFREY CHERNICK move his Cayman Island account to open an account in UBS' Hong Kong office.  JEFFREY CHERNICK opened up UBS AG accounts in Hong Kong in early 2000.  JEFFREY CHERNICK's UBS Hong Kong account was opened under SIMBA.  In 2001, Hirsch began managing the UBS Hong Kong account, then containing approximately $1 million with no U.S. securities.  Hirsch advised JEFFREY CHERNICK to buy and hold U.S. securities in the Hong Kong account without disclosing that JEFFREY CHERNICK

1   would have to report such holdings to the U.S. or otherwise advising him of the QI
2   Agreement terms.

3        87.    In 2004, JEFFREY CHERNICK transferred additional funds from his Bank
4   of Bermuda and Butterfield SIMBA accounts to his UBS AG in Hong Kong SIMBA
5   account. In so doing, JEFFREY CHERNICK closed his account with Bank of Bermuda.
6   In June 2004, Hirsch retired from UBS and Pang replaced Hirsch as JEFFREY
7   CHERNICK's financial advisor.  Pang at all times continued recommending holding
8   U.S. securities as Hirsch had previously recommended.

9        88.    In 2001, Thomann, along with Bigger, caused JEFFREY CHERNICK to
10   transfer his SHAMBA account from the Cayman Islands to UBS AG in Zurich.
11   Thereafter, Thomann briefly became the primary advisor on JEFFREY CHERNICK's
12   UBS AG Zurich accounts until Bigger relocated to Zurich at which time Thomann co-
13   managed the accounts with Bigger.

14        89.    In 2002, Beda Singenberger at Sinco Truland AG was hired by UBS AG to
15   set up a trust for JEFFREY CHERNICK.  Singenberger was purportedly fired shortly
16   thereafter and replaced by Rickenbach.  Rickenbach, with the authorization of UBS AG,
17   replaced Beda Singenberger and caused the setup of a sham entity to hold SHAMBA
18   and SIMBA.

19        90.    In May 2003, Rickenbach recommended that JEFFREY CHERNICK
20   transfer some of the SHAMBA account assets he held at the Bank of Bermuda to
21   Kantonalbank where Schumacher and NZB would manage them. In April 2003,
22   Thomann called JEFFREY CHERNICK informing him that he resigned from UBS AG
23   to work for Delta.

24        91.    In 2003, Beeler took over for managing JEFFREY CHERNICK's
25   SHAMBA Account at UBS AG in Thomann's place.  Beeler only served as JEFFREY
26   CHERNICK's UBS AG investment advisor for approximately one and a half years.  In
27   October 2004, JEFFREY CHERNICK had a meeting with Beeler and Benz about his
28   accounts. JEFFREY CHERNICK had no further dealings with Benz after this meeting.

92.   In or around 2004, JEFFREY CHERNICK transferred some of the assets in his SHAMBA Account with UBS AG to Wegelin.  JEFFREY CHERNICK maintained his Wegelin account and continued to work with Thomann until 2009.

93.   In 2006, Bigger caused JEFFREY CHERNICK to close his SIMBA Account at UBS Hong Kong and transfer the assets therein, including U.S. securities, into his SHAMBA account at UBS Zurich.

94.   In approximately June of 2008, Bigger told JEFFREY CHERNICK that from then on he would neither handle North American accounts nor travel to the United States. Bigger informed JEFFREY CHERNICK that if he wanted to maintain his SHAMBA Account, UBS Zurich would only manage it in a pool of like-accounts. JEFFREY CHERNICK did not agree to this arrangement.

95.   When Bigger informed JEFFREY CHERNICK that he could no longer manage his SHAMBA Account at UBS AG, JEFFREY CHERNICK asked Rickenbach to recommend someone who could handle those assets.

96.   On OR ABOUT June 4, 2008, JEFFREY CHERNICK met with two referrals.  After this meeting, JEFFREY CHERNICK sought Schumacher's advice on these two referrals to which Schumacher recommended against transferring assets to Baer accounts.

**CARRYING OUT THE SCHEME**

97.   Starting out with Plaintiffs' assets held in general accounts, UBS AG and regularly traded securities on behalf of Plaintiffs.  In each instance, said Defendants misrepresented their proper licensure to make each transaction legally prior to and at the time of each transaction.  Because their employees were not properly licensed, each of these transactions was improper at the time of transacting and in violation of U.S. Securities Regulations as well as California, Washington, New York, and Florida state statutes. Additionally, UBS AG, between 2001 and 2010, consistently and regularly sent

1  statements to Plaintiffs at their respective locations, including Kern County as to the
2  ROBERTS.

3      98.    Importantly, throughout the relationship between the UBS AG Defendants
4  and Plaintiffs, the UBS Defendants and their co-conspirators repeatedly assured
5  Plaintiffs that the management scheme and structure of their investments had been
6  reviewed by UBS AG attorneys and were authorized by and in compliance with U.S.
7  reporting laws.

8

9  **Intentional Omissions and UBS AG's Duplicity**

10     99.    Leading up to this, and thereafter, the UBS AG Defendants, regularly met
11  with Plaintiffs, the illegality of UBS AG's scheme, any problems related to the tax and
12  investment advice, and/or the likelihood that each Plaintiff would be subject to tax
13  penalties, interest, and criminal investigation as a result of UBS AG's scheme, all the
14  while continuing to manage Plaintiffs' respective funds in accordance with the scheme.

15  **ADMISSIONS BY UBS TO DATE**

16     100.   As has been widely publicized, UBS had been engaged in a heated battle
17  with the IRS and DOJ regarding UBS's intentional acts dating back to the QI Agreement
18  in 2001 and continuing through 2009. The following is a brief chronology of the events
19  and admissions by UBS and/or its directors and officers:

20              a. In November 2008, the U.S. filed an indictment against Weil
21                 further outlining Executives, Managers, Desk Heads, and Bankers
22                 as knowing participants in the scheme to defraud the IRS of taxes
23                 due by its customers.

24              b. On February 18, 2009, UBS and the U.S. entered a Deferred
25                 Prosecution Agreement ("DPA") in which UBS admitted, among
26                 other things, that beginning in 2000 and continuing until 2007 it
27                 had "participated in a scheme to defraud the United States and its
28                 agency, the IRS by actively assisting or otherwise facilitating a

number of United States individual taxpayers in establishing accounts at UBS in a manner designed to conceal the United States taxpayers' ownership or beneficial interest in these accounts."

c. On or about February 18, 2009, UBS's acting Chairman, and former General Counsel during the 2000 – 2007 period, Peter Kurer publicly stated that "UBS sincerely regrets the compliance failures in its U.S. cross-border business that have been identified by the various government investigations in Switzerland and the U.S., as well as our own internal review. We accept full responsibility for these improper activities." Marcel Rohner, group chief executive of UBS AG added, "it is apparent that as an organization we made mistakes and that our control systems were inadequate."

d. On February 18, 2009 the Securities Exchange Commission ("SEC") filed a complaint against UBS for acting as an unregistered broker-dealer and investment adviser to thousands of U.S. cross-border clients.

e. On February 19, 2009, the IRS filed a civil action against UBS to enforce a "John Doe" summons seeking names of UBS's U.S. customers.

f. On March 4, 2009, at a U.S. Senate Subcommittee hearing, UBS's Chief Financial Officer, Mark Branson, admitted UBS AG was intent on keeping wealthy investors with UBS while scheming to defraud the IRS of taxes.

g. Between April and July 2009, UBS and the DOJ, as well as U.S. and Swiss politicians, wrangled over the privacy/secrecy issues as trial approaches in July 2009;

h. On June 30, 2009, the IRS filed a Memorandum of Law in Support of Petition to Enforce "John Doe" Summons which details UBS's violations, its acknowledgment that it would be subject to U.S. jurisdiction and the scheme as provided in the instant Complaint.

i. On July 12, 2009, the U.S. District Court in Miami suspended the July 13, 2009 hearing on the Motion to Enforce for 30 days, anticipating a settlement between UBS and the IRS/DOJ;

j. On August 12, 2009, the U.S. and UBS reached an agreement in principle the terms of which include the revelation of approximately 4,450 UBS customer names.

Additionally, on or about July 29, 2009, it was revealed that documents exist to show that UBS tried to entice wealthy Latin Americans to use a program designed to result in tax evasion problems for these Latin Americans, some of whom were taxable in the U.S. The "Referral Program," cited to a "success model" showing $200 million to be moved to Switzerland, referring to another U.S. customer's account.

Further, on August 21, 2009, former UBS AG banker Bradley Birkenfeld was sentenced to 40 months in prison for his participation in the scheme that cost the IRS billions in tax losses. Notably, this was a reduction in the 60-month term he would have received had he not admitted to his illegal conduct and given the DOJ information that corroborates the facts and charges against UBS AG by the IRS, DOJ, as well as Plaintiffs in this complaint.

**Criminal Liability for Defendants' Scheme**

101. By 2010, the IRS and Department of Justice approached each Plaintiff and advised him or her that the "investments" from 2001 forward were indeed subject to taxation. Each Plaintiff eventually faced criminal investigation relating to the shell company structure set up and carried out by Defendants. They agreed to pay millions of dollars in tax penalties, plus interest, on top of related costs and professional

- 30 -

fees.  Although each was a pawn and victim of a greedy scheme by the aforementioned Defendants, each Plaintiff had no choice but to take this course of action.  In the end, they would be labeled as "tax cheat" subjecting them and their business to unfair discrimination.

102.  On April 10, 2008, one UBS banker and third party co-conspirator were indicted on charges of conspiracy to defraud the United States and the IRS in violation of Title 18, United States Code, Section 371.  The indictment includes the following charges, which are incorporated herein, as follows:

     a.    "It was part of the conspiracy that Birkenfeld, Staggl and others would and did market the advantages of Swiss and Liechtenstein bank secrecy to United States clients by claiming that said secrecy was impenetrable;

     b.    Birkenfeld, Staggl, and others would and did travel to the United States to market investments including United States securities to United States clients which they were not licensed to market;

     c.    That said marketing also took place via mail, emails and telephone calls to and from the United States;

     d.    That said defendants would and did travel to the United States to conduct banking with United States clients;

     e.    That said defendants would and did conduct banking with United States clients from Switzerland, Liechtenstein, and elsewhere via mailings, emails, and telephone calls to and from the United States;

     f.    That said defendants would and did prepare Swiss and Liechtenstein bank account applications, and IRS Forms W-8BEN, which falsely and fraudulently concealed that United States Taxpayers were the beneficial owners of offshore bank

and financial accounts maintained in foreign countries, including Switzerland and Lichtenstein;

g.    That said defendants would and did cause shell companies to be set up and used as the nominee owners for the Swiss Bank and Liechtenstein bank accounts in order to conceal United States citizens' beneficial ownership of the bank accounts;

h.    That said defendants would and did cause to be prepared and filed with the IRS income tax returns that purposefully and intentionally falsely and fraudulently omitted income earned by United States clients from their Swiss bank and Liechtenstein bank accounts;

i.    That said defendants would and did cause to be prepared and filed with the IRS income tax returns that purposefully and intentionally falsely and fraudulently reported that United States clients did not have an interest in, and a signature and authority over, financial accounts located in a foreign country."

103.   As evidenced in the April 10, 2006 indictment and the June 19, 2008 plea agreement of another UBS AG banker, Bradley Birkenfeld, and his August 21, 2009 sentencing, he has admitted to each of the above indictment charges stemming out of his activities as an agent of UBS AG. On or about November 13, 2008, the DOJ indicted Defendant Weil for his conduct as an executive of UBS AG in defrauding the IRS through the scheme alleged in this complaint.

104.   Based on the foregoing, and as more fully detailed herein below, each of the Plaintiffs are entitled to recover their respective lost and converted assets, all of the fraudulent and/or unnecessary fees, tax penalties and interest, compensatory damages for the loss of personal and professional reputation and punitive damages from each and all of the Defendants who worked in concert for years to defraud both the IRS and each

1   Plaintiff of millions of dollars, collectively causing tens of millions of dollars in
2   damages.

3                                    **COUNT I**

4        (Fraudulent Misrepresentation and Concealment Against the UBS AG Defendants;
5                           and DOES 1 through 10, inclusive)

6            105.   Plaintiffs repeat and reallege each and every prior allegation, as if
7   fully set forth herein.

8            106.   For the purposes of inducing Plaintiff to transfer the their account
9   investments to UBS AG and to pay millions of dollars in aggregate fees while also
10  allowing themselves to advertise and report higher account values and superior status
11  versus competitors, each of the previously specifically identified individual Defendants
12  made   numerous   knowingly   false   affirmative   representations   and/or   intentional
13  omissions/concealments of material facts to each Plaintiff, continuously between 2000
14  and 2009, including but not limited to:

15                   a.    UBS AG and its third party affiliates would prepare proper and
16                         legal documentation for the formation of, and form, shell
17                         corporations with the representation that said formations were
18                         permitted by the IRS;

19                   b.    That Plaintiffs would not need to be a named signatory on
20                         certain accounts due to the need to maintain the high level of
21                         legal privacy;

22                   c.    That each Plaintiff should follow the estate planning and tax
23                         opinions and advice rendered by UBS AG and its third party
24                         affiliates pertaining to lawful requirements for report of off-
25                         shore assets as required by the IRS from 2002 through 2009;

26                   d.    That the method by which UBS AG and its third party
27                         affiliates titled the ownership of the accounts would be fully

28

compliant with all U.S. reporting requirements while repeatedly omitting what the actual requirements were;

e.   That UBS AG and its third party affiliates would prepare all the necessary and proper forms to be submitted to the Internal Revenue Service to report all income and accounts required to be reported to the Internal Revenue Service to ensure each Plaintiff would comply with all U.S. tax reporting requirements;

f.   That each Plaintiff's financial information would be protected and held in confidence;

g.   That the Defendants would manage each Plaintiff's respective assets in a lawful and prudent manner and use the care and expertise of a fiduciary with respect thereto;

h.   Repeatedly representing to each Plaintiff that UBS AG bankers were properly licensed, or, in the alternative repeatedly omitting the fact that they were *not* licensed, and thus, permitted to provide banking services, offer investment advice and management of funds and to solicit the purchase or sale of securities to U.S. citizens, including Plaintiffs; and

107.   The above intentional omissions of material fact and/or affirmative misrepresentations and concealments made by each Defendant were false when made and said Defendants knew these representations to be false when made and that said concealments were necessary to disclose. Moreover, they were made with the intention that all of UBS AG's U.S. customers, including each Plaintiff, would rely upon them in transferring funds to Defendants' accounts, or maintaining pre-existing accounts, and for Defendants' use so that said customers, including Plaintiffs, would pay them millions of dollars in fees and costs and giving them access to Plaintiffs' funds for their personal and collective profit motives.

108.   The true facts are that:

    a.   The documentation prepared by the UBS AG Defendants and co-conspirators for the formation of shell corporations was not a permissible tax deferment scheme under the QI Agreement nor under U.S. tax reporting laws;

    b.   The UBS AG Defendants and co-conspirators prepared documentation for opening off-shore bank and investment accounts, represented that each Plaintiff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy, and then failed to report each Plaintiff's information to the IRS pursuant to the QI agreement;

    c.   The UBS AG Defendants scheme, as described above, was not lawful and permitted by the IRS pursuant to the QI Agreement;

    d.   The UBS AG Defendants provided and/or caused to be provided erroneous legal and tax advice by, among other things, intentionally preparing wrongful and misleading documents and sending them to each respective Plaintiff from 2002 through 2009;

    e.   The UBS AG Defendants continuously concealed from each Plaintiff that they not only owed taxes on their investments with the IRS but would face criminal investigation for the management structure of their respective accounts set up by the UBS AG Defendants; and

    f.   The UBS AG Defendants were not properly licensed and thus, not permitted to provide banking services, offer investment advice manage funds and/or solicit the purchase or sale of securities to U.S. citizens, including each Plaintiff.

109. In reasonable reliance on said Defendants' false affirmative representations and intentional omissions of material facts regarding taxes, rules, liabilities, proceeds, privacy and investment results, Plaintiffs each paid anywhere from thousands to hundreds of thousands of dollars to Defendants for flawed tax and investment advice, to execute transactions, purchase unnecessary "investments" to effectuate useless transactions, false investment and/or tax savings opportunities, and file tax returns that reflected control and beneficial ownership of their assets held by the offshore entities created by Defendants.

110. But for Defendants' intentional misrepresentations and material omissions described above, each Plaintiff would never have: participated in the transfers of funds and transactions or otherwise maintained their accounts, purchased unnecessary investments, allowed the opening of shell corporations and/or failed to avail themselves of legitimate investment and/or tax savings opportunities, failed to pay their meager tax bills each year, nor would he have incurred millions in penalties, and interest.

111. As a result of Defendants' conduct, described above, each Plaintiff has suffered injury in that they each:

        a.    Paid Defendants thousands to hundreds of thousands of dollars in fees and costs which they should not have paid;

        b.    Had portions of their accounts converted by Defendants;

        c.    Purchased unnecessary investments to effectuate the recommended transactions;

        d.    Incurred severe and unnecessary tax penalties and interest;

        e.    Spent time in prison, for some Plaintiffs;

        f.    Suffered personal and professional embarrassment and tarnished family and business names; and

        g.    Consequently missed legitimate investment and/or tax savings opportunities.

112.   As a proximate cause of the foregoing, each Plaintiff has been injured in a separate amounts to be proven at trial, but each in excess of $1 Million dollars.

113.   The aforementioned actions and omissions of Defendants and DOES 1 through 10, and each of them, were committed with the intent to misrepresent, deceive, and/or conceal material facts known to each of the defendants so that the Defendants, and each of them, could deprive each Plaintiff of property, legal rights and/or otherwise cause injury to each Plaintiff.  The aforementioned actions and omissions of Defendants and DOES 1 through 10, and each of them, amounted to despicable conduct that subjected each Plaintiff to cruel and unjust hardship and all in a conscious and utter disregard of said Plaintiffs' rights, so as to justify an award of exemplary and punitive damages.  Further, Plaintiffs are entitled to rescind any contract and/or transaction and to recover restitution for all fees paid to each and any of Defendants, plus reasonable attorney's fees and costs.

## COUNT II

### (Constructive Fraud Against the UBS AG Defendants; and DOES 1 through 10, inclusive)

114.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

115.   Defendants, and each of them, maintained a confidential and fiduciary relationship in their capacities as advisors and even signatories to the Olen accounts or created "investments."

116.   As such, all Defendants, and each of them, owed a duty to manage each Plaintiffs' assets properly, to advise them of any IRS requirements, report and withhold taxes consistent with IRS requirements and the QI Agreement, to avoid each Plaintiffs' suffering of any U.S. tax-related penalties, interest, and criminal investigation related thereto, to invest their assets in proper vehicles such that all costs and fees were minimized and in accordance with their promised fee structure, to invest the assets in a reasonably prudent manner within the scope of the promised goals and return rate, to

ensure proper licensure of all persons soliciting and/or conducting transactions with each Plaintiff, and to avoid unauthorized usage of funds and payments to themselves vis-à-vis corporate shells and other third party companies, plus other conversions of money.

117. Each Defendant owed each Plaintiff an additional duty of confidentiality and privacy, which served as the other main basis for investing with said Defendants.

118. Each Plaintiff reasonably relied on the misrepresentations and omissions of Defendants as the purpose of the account transfers was to ensure better and lawful savings than he was already achieving with funds already accounted for with the IRS and the acknowledged purpose of confidentiality and privacy. Such reliance is actually presumed pursuant to *Edmunds v. Valley Circle Estates*, 16 Cal.App.4th 1290, 1302, 20 Cal.Rptr.2d 701, 708 (1993).

119. As previously alleged, said duties were breached when Defendants: prepared documentation for the formation of, and did so form, shell corporations with the representation that said formations were permitted by the IRS; prepared documentation for and opened off-shore bank and investment accounts, including the fact that they were not properly licensed to do so; represented that each Plaintiff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy; failed to properly report each Plaintiff's information to the IRS or withhold taxes pursuant to the QI agreement; knowingly provided erroneous tax opinions; concealed from each Plaintiff that each would face criminal investigation for the management structure of their respective accounts set up by the UBS AG Defendants; formed shell corporations and/or invested in corporations utilizing Plaintiffs' assets without advising Plaintiffs, all of which were caused by Defendants advice and proactive misrepresentations and concealments.

120. Additionally, UBS AG breached its duties of confidentiality by providing information to the IRS in violation of Swiss Law and in violation of its own protocols for when to properly do so.

121.   Within the last three years of the date of this complaint, each Plaintiff became aware of the aforementioned breaches of fiduciary and confidentiality duties.

122.   As a result of said breaches of fiduciary duties and confidentiality, Defendants gained an advantage by receiving between tens of thousands and hundreds of thousands of dollars in fees, costs, and converted funds from each Plaintiff from 2000 through 2009.

123.   Based on the foregoing breaches of fiduciary and confidentiality duties, each Plaintiff has been damaged by the amounts improperly gained by Defendants in the amount of at least $1 million dollars each, subject to proof.  Each Plaintiff is further entitled to recoup out-of-pocket damages, including all fees, costs, tax penalties, and interest, plus attorneys' fees and costs.

124.   The aforementioned conduct of the UBS AG Defendants and DOES 1 through 10, and each of them, was an intentional misrepresentation, deceit, or concealment of a material fact known to each of the Defendants with the intention on the part of the Defendants of thereby depriving each Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected each Plaintiff to a cruel and unjust hardship and all in a conscious and utter disregard of each Plaintiff's rights, so as to justify an award of exemplary and punitive damages.  Further, Plaintiffs are entitled to rescind any contract and to recover restitution for all fees paid to Defendants, plus reasonable attorney's fees and costs.

## COUNT III

(Negligent Misrepresentation Against the UBS AG Defendants; and DOES 1 through 10, inclusive)

125.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

126.   The representations described above were false or misleading when made by Defendants, as described above, were made without a reasonable basis for believing it to be true, and were made with intent to mislead and deceive all of UBS

AG's U.S. customers, including Plaintiffs.  The representations were made with the intent to induce each Plaintiff's reliance and to invest in the investment schemes as herein alleged.

127.  Each of the Defendants had a duty to disclose the true information and documentation on the grounds that said information and documentation were material to the asset transfers and investments alleged herein and that Defendants were required to abide by the QI Agreement.

128.  Defendants' failures to disclose these material facts and present proper documentation to each Plaintiff, therefore, constitute fraud and/or negligent misrepresentation.

129.  Had each Plaintiff known of the true facts, that Defendants were manipulating them to open or maintain accounts, intending to and did breach the QI Agreement, failing to present proper documentation to each Plaintiff, charging unnecessary fees, causing each Plaintiff to incur tax penalties and interest for failing to properly file documents with the IRS, converting assets, and perpetuating this scheme against the IRS and 52,000 other customers, each Plaintiff would not have transferred and/or maintained their respective assets into UBS AG accounts, engaged with third party service providers, or otherwise dealt with any UBS AG representatives or third party service providers.

130.  As a proximate result of the fraudulent conduct of Defendants as herein alleged, each Plaintiff has incurred damages in that each Plaintiff was induced to invest with UBS AG as unwitting pawns in Defendants' collective schemes to reap millions of dollars annually, maintain their superior reputations in the industry and convert millions of dollars, all by reason of which each Plaintiff has been damaged in at least a sum in excess of $1 million dollars, and additional amounts according to proof at time of trial, including interest, attorneys' fees and costs.  Further, Plaintiffs are entitled to rescind any contract and to recover restitution for all fees paid to Defendants, plus reasonable attorney's fees and costs.

## COUNT IV

(Fraud in Connection With the Purchase or Sale of Securities Violations of Section 10(b) of the Exchange Act and Rule 10b-5 There under Rule 10(b) 5 Against All Defendants; and DOES 1 through 10, inclusive)

131.    Plaintiffs repeat, reallege and reincorporate each and every allegation contained in the General Allegations and all previous paragraphs of all previous sections and Claims for Relief this Complaint, inclusive, as though fully set forth herein. Throughout Years 2000 through 2010, Defendants, each by engaging in the conspiratorial conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: (1) employed the previously described conspiratorial devices, schemes, or artifices to defraud; (2) made untrue statements of material facts *and* omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon each Plaintiff, and as time will reveal, many others.

132.    By engaging in the conduct described above, Defendants, and each of them, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 there under, 17 C.F.R. § 240.10b-5.

133.    As a proximate result of the fraudulent conduct of Defendants as herein alleged, each Plaintiff has incurred damages in that he was induced to transfer assets and/or maintain and invest in the above-described scheme, has suffered losses in the values of improper and unauthorized securities purchased and held, has incurred tens of thousands of dollars in self-dealing fees and costs, and been subjected to transactions for which none of the Defendants were properly licensed.  Accordingly Plaintiffs have

1  been damaged in at least the sum in excess of $1 million dollars, and additional amounts

2  according to proof at time of trial, including interest, attorneys' fees and costs.

3  ## COUNT V

4  (Damages for Sales of Securities by Means of Communications Containing False

5  Statements and Omissions - Violations Of Section 25401 and 25501 of California

6  Corporations Code Against All Defendants; And DOES 1 through 10, Inclusive)

7       134.   Plaintiffs repeat, reallege and reincorporate each and every allegation

8  contained in the General Allegations and all previous paragraphs of all previous sections

9  and Claims for Relief in this Complaint, inclusive, as though fully set forth herein.

10       135.   Defendants, and each of them, by engaging in the conspiratorial

11  conduct described above, offered and sold securities, without proper licensure, in the

12  state of California, continuously between 2000 and 2009, by means of both written and

13  oral communications which included untrue statements of material facts and omissions

14  of material facts necessary in order to make the statements made, in light of the

15  circumstances under which they were made, not misleading.   The false affirmative

16  representations and intentional omissions/concealments of material facts to each Plaintiff

17  that the UBS AG Defendants did, including. but not limited to:

18       a.   That UBS AG and/or its third party affiliates would prepare

19  proper and legal documentation for the formation of, and form,

20  shell corporations with the representation that said formations

21  were permitted by the IRS;

22       b.   Representing that each Plaintiff would not need to be a named

23  signatory on certain accounts due to the need to maintain the

24  high level of legal privacy;

25       c.   Representing that each Plaintiff should follow the estate

26  planning and tax opinions and advice rendered by Defendants

27  pertaining to lawful requirements for report of their off-shore

28

- 42 -

**COMPLAINT**

assets as required by the IRS from 2001 through 2009, or 2010 in some instances;

d.    Representing to each Plaintiff that the method by which Defendants titled the ownership of the accounts with Defendants would be fully compliant with all U.S. reporting requirements;

e.    Representing that the Defendants would prepare all the necessary and proper forms to be submitted to the Internal Revenue Service to report all income and accounts required to be reported to the Internal Revenue Service to ensure each Plaintiff would comply with all U.S. tax reporting requirements;

f.    Representing that each Plaintiff's financial information would be protected and held in confidence;

g.    Representing to each Plaintiff that the Defendants would manage their respective assets in a lawful and prudent manner and use the care and expertise of a fiduciary with respect thereto; and

h.    Representing to each Plaintiff that Defendants were properly licensed and thus, permitted to provide banking services, offer investment advice and management of funds and to solicit the purchase or sale of securities to U.S. citizens, including each Plaintiff;

136. As a proximate result of the fraudulent conduct of Defendants as herein alleged, each Plaintiff has incurred damages in that he or she was induced to transfer assets and/or maintain them and invest in the above-described scheme, has suffered losses in the values of securities purchased and held, has had their account wrongfully frozen, thereby resulting in loss of value, has incurred thousands to hundreds

of thousands in self-dealing fees and costs, and been subjected to transactions for which none of the Defendants were properly licensed.

137.  Accordingly each Plaintiff has been damaged in at least the sum in excess of $1 million dollars, and additional amounts according to proof at time of trial, including interest, attorneys' fees and costs.

138.  The aforementioned conduct of Defendants, and each of them, was an intentional misrepresentation, deceit, or concealment of material facts known to each of the Defendants with the intention on the part of the Defendants of thereby depriving each Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected each Plaintiff to a cruel and unjust hardship and conscious disregard of his or her rights, so as to justify an award of exemplary and punitive damages.

## COUNT VI

(Breach of Fiduciary Duty Against the UBS Defendants; and DOES 1 through 10, inclusive)

139.  Plaintiffs repeat and reallege each and every prior allegation and Claim for Relief, as if fully set forth herein.

140.  Defendants held and continue to hold themselves out to the public, and held themselves out to U.S. customers, including Plaintiffs, as experts with particular competence in investment and tax matters, who were properly licensed to provide banking services, offer investment advice, manage funds and solicit and execute the purchase and sale of securities to and for U.S. citizens.  Defendants each made promises of return rates on investments and further opined and directed each Plaintiff, verbally and in writing, regarding his tax filing requirements and asset disclosure requirements.

141.  Defendants further improperly and inappropriately "managed" each Plaintiff's assets by opening and/or maintaining accounts, creating entities, investing in stocks, bonds, funds, and corporate entities.  Moreover, each Defendant charged fees,

froze accounts, and/or otherwise converted each Plaintiff's assets such that the assets did not grow as they would have had they managed his assets in a reasonably prudent manner within the scope of authority provided to Defendants.

142. In connection with the investment scheme, each Defendant, as connected to each Plaintiff as previously described hereinabove, was one of each Plaintiffs' fiduciaries and, thus, owed him or her the undivided duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility. Each Plaintiff relied on each respective Defendant to act as Plaintiffs' respective fiduciary and to advise him or her as to the legitimacy of his or her transactions, the propriety of the tax disclosures, claims related to the ownership scheme, and to refrain from arbitrarily freezing each Plaintiffs' account for any period of time.

143. In truth, the investment scheme lacked economic substance, was designed to generate millions in revenue to Defendants and was contrary to the Internal Revenue Code, Treasury Regulations, policies of the IRS, and the QI Agreement, all of which were known to each Defendant, or which should have been known to each of them upon the exercise of reasonable professional research and judgment.

144. Defendants breached their respective fiduciary duties to each Plaintiff by, *inter alia*, the following acts and/or omissions:

    a.    Taking advantage of a relationship of trust and confidence and using their respective and collective knowledge of each Plaintiff's confidential information to solicit him or her to transfer assets to, or maintain accounts with, UBS AG, and to give control to the UBS AG Defendants;

    b.    Charging and collecting unreasonable, excessive, and unethical fees;

    c.    Failing to disclose and comply with the QI Agreement and other disclosure and tax law requirements;

    d.    Breaching the QI Agreement;

e.   Planning and implementing a scheme by which Defendants could manipulate and trick their U.S. clients, including each Plaintiff, into keeping their assets with UBS AG and held by specific trusts;

f.   Advising each Plaintiff that the transactions were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

g.   Failing to advise each Plaintiff that the Defendants were not properly licensed to provide banking services, offer investment advice, manage funds and solicit and execute the purchase and sale of securities to and for U.S. citizens which said licensing was specifically avoided so that the illegal activities of the Defendants would go undetected by U.S. regulating authorities;

h.   Recommending, advising, instructing, and assisting each Plaintiff in the formation of unnecessary business entities and incurring unnecessary fees, penalties and criminal investigations related thereto;

i.   Transferring assets to the names of said "shell" entities thereby causing additional unnecessary fees;

j.   Promoting and selling unregistered and ineffective tax shelters;

k.   Failing to obtain and ensure licensure of UBS AG's bankers, and others regarding the provision of banking services, investment advice and/or soliciting the purchase or sale of securities through contact with clients in the U.S.;

l.   Failing to ensure that the advised transactions complied with applicable federal rules and regulations;

m.   Failing to comply with their respective ethical obligations to each Plaintiff and violating their respective professional rules of conduct;

n.   Providing erroneous legal and tax opinions and advice;

o.   Providing personal financial information as well as erroneous financial information to third parties while maintaining that such information would be held in strict confidence and/or that each Plaintiff would be advised of any intent to disclose such information;

p.   Each individual banker, director, board member and third party service provider breached his respective fiduciary duties to each Plaintiff by, *inter alia*, taking advantage of a relationship of trust and confidence and using his respective and collective knowledge of each Plaintiff's confidential information by providing personal financial information, as well as erroneous financial information, to the IRS and DOJ while maintaining that the structures of each Plaintiffs' respective accounts was fully compliant with all U.S. laws, such information would be held in strict confidence and/or that each Plaintiff would be advised of any intent to disclose such information;

q.   Defendant UBS AG breached its fiduciary duties to each Plaintiff by, *inter alia*, failing to properly manage and supervise its representatives in an appropriate manner resulting in the aforementioned consequences to each Plaintiff.

145. As a result of Defendants' respective conduct, each Plaintiff has suffered injury in that, among other things, each Plaintiff:

a.     Paid Defendants thousands to tens of thousands of dollars annually in unearned management fees and transaction fees which amounts should not have been charged to him;

b.     Incurred and paid millions of dollars in tax penalties and interest for ignorantly failing to pay meager taxes on meager profits over an approximate 8-year period;

c.     Has incurred, and will continue to incur, substantial additional costs in hiring tax and legal advisors to address their respective injuries;

d.     Has lost the opportunity to engage in legitimate tax savings opportunities;

e.     Was criminally investigated by the Department of Justice for the tax shelter scheme devised by Defendants ; and

f.     Has suffered, and will continue to suffer, constant and relentless negative press, regulatory and/or business association penalties associated with the Defendant's scheme causing each Plaintiff and his or her family great personal and professional embarrassment and affecting their respective business reputations.

146.   As a proximate cause of the foregoing, each Plaintiff has been injured in an actual amount to be proven at trial, but at least $1 Million dollars, and should further be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## **COUNT VII**

(Violation of 18 U.S.C. § 1962(c) – Federal RICO Against All Defendants; and DOES 1 through 10, inclusive)

147.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

148.   At all times relevant to this complaint, all Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3).

149.   At all times relevant to this complaint, the foregoing Defendants directly or indirectly maintained an interest in or participated in the operation of UBS AG which are "enterprises" within the meaning of 18 U.S.C. § 1961(4).

150.   As set forth more fully above in the factual allegations, the foregoing Defendants corrupted each of the entities and enterprises and caused each Plaintiff damage through a pattern of racketeering activity.   At all times relevant to this Complaint, the foregoing Defendants conducted or participated, directly or indirectly, in the operation and management of the numerous entity defendants through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and § 1962(c). As set forth in detail in the factual allegations, and incorporated herein by reference, this pattern of racketeering activity entailed at least two of the following predicate acts of racketeering activity per each of the foregoing Defendants:

    a. Embezzlement by the UBS AG Defendants and the third party affiliates who set up improper trusts continuously and repeatedly between 2000 and 2008 and who further took money from Plaintiffs under false pretenses between 2008 and 2010;

    b. Fraudulent misrepresentation and concealment by the previously described individuals on behalf of UBS AG continuously and repeatedly between 2000 and 2010 relating to fund management, tax legalities, liabilities, and filing requirements, privacy, quality of securities, true price of securities, misappropriation of funds, and true use of assets;

    c. Securities fraud continuously and repeatedly between 2000 and 2010, including intentional statutory and governmental violations of selling securities without proper licensure, and ignoring non-licensure of employees and third party securities promoters.

d. These activities took place by mail and/or wire by way of monthly statements sent to each Plaintiff from approximately 2001 through 2010, plus letters of correspondence in 2010 regarding account closure matters.

151.   The aforementioned pattern of racketeering consisted of a multitude of acts that are indictable under 18 U.S.C. §§ 1341, 1343, and 1346 and are within the scope of 18 U.S.C. § 1961(a)(A) and (1)(B).   As set out more fully herein, the commission of at least two of those related predicate acts over the last 10 years constituted a continuous and related pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and (5).

152.   As part of, and in further of, the fraudulent schemes and artifices previously described, said Defendants made repeated use of, or had reason to believe that others would use, the U.S. Postal Service, interstate overnight couriers, and the interstate wires to transmit various documents, including, without limitation, letters, financial statements, account statements, contracts, and miscellaneous records.

153.   Each transmission constituted either the transmittal by means of wire communication in interstate commerce of signals, sounds or writings; the use of the U.S. Postal service; or the use of interstate overnight couriers for the purpose of executing or in connection with the aforementioned schemes and artifices to defraud Plaintiffs, and other third parties.   The foregoing Defendants knew, or had reason to believe, that these transmissions were in furtherance of advancing the aforementioned corrupt enterprises or were incidental to an essential part of the aforementioned corrupt enterprise.

154.   As described in Paragraph 151, said Defendants made or caused these transmissions to be made with the specific intent of defrauding Plaintiffs and other investors and potential investors in UBS AG. Each of these transmissions furthered the aforementioned schemes and artifices to defraud, which were intended to, and did, proximately cause injury to Plaintiffs and others in their business and property.   Those

acts constituted offenses indictable as crimes under, the "mail fraud" and "wire fraud" statutes, 18 U.S.C. §§ 1341, 1343 and 1346.

155.   Plaintiffs reasonably relied upon the oral and written statements made to them by said Defendants in connection with the aforementioned schemes or artifices to defraud.

156.   As a result of the foregoing, each Plaintiff has sustained substantial damages and/or irreparable harm in an amount to be proven at trial, but in excess of $1 Million per Plaintiff.

## COUNT VIII

(Violation of 18 U.S.C. § 1962(d) – Federal RICO Conspiracy Against All Defendants; and DOES 1 through 10, inclusive)

157.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

158.   As more specifically set forth in the factual allegations above, since 2000, through and including 2010, Defendants unlawfully and willfully combined, conspired, confederated and agreed between and amongst each other to jointly violate 18 U.S.C. § 1962(c), i.e. to conduct and participate, directly and indirectly, in the affairs of UBS AG and its affiliated professional service providers and other yet-to-be identified entities through a pattern of racketeering, all in violation of 18 U.S.C. § 1962(d).

159.   As part of this conspiracy, each of the foregoing Defendants personally agreed to commit and, in fact, committed two or more predicate racketeering acts within the last 10 years, including, but not limited to, embezzlement, fraud, and securities fraud, and agreed to conduct and, in fact, conducted the affairs of UBS AG and third party affiliated service providers, and other yet-to-be identified entities through a pattern of racketeering activity in violation of U.S.C. § 1962(c).  More specifically, Defendants engaged in the following:

a. Embezzlement by the UBS AG Defendants and the third party affiliates who set up improper trusts continuously and repeatedly between 2000 and 2008 and who further took money from Plaintiffs under false pretenses between 2008 and 2010;

b. Fraudulent misrepresentation and concealment by the previously described individuals on behalf of UBS AG continuously and repeatedly between 2000 and 2010 relating to fund management, tax legalities, liabilities, and filing requirements, privacy, quality of securities, true price of securities, misappropriation of funds, and true use of assets;

c. Securities fraud continuously and repeatedly between 2000 and 2010, including intentional statutory and governmental violations of selling securities without proper licensure, and ignoring non-licensure of employees and third party securities promoters.

d. These activities took place by mail and/or wire by way of monthly statements and correspondence from approximately 2001 through 2010.

160.   As a result, each Plaintiff has sustained substantial damages and has been irreparably harmed in an amount to be proven at trial, but at least $1 Million per Plaintiff.

## COUNT IX

(Professional Malpractice Against All Defendants; and DOES 1 through 10, inclusive)

161.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

162.   As investment and tax advisers to each respective Plaintiff, Defendants and DOES 1 through 10, and each of them, owed said Plaintiffs undivided duties of care, loyalty and honesty, a duty to comply with the applicable standards of care, and a duty to comply with the applicable provisions of their codes of professional responsibility.

163.   Said Defendants also owed a duty to each Plaintiff to meet the applicable standard of care for accountants and financial advisors.   Said Defendants failed to meet the applicable standards of care, which proximately caused damages to each Plaintiff as set forth elsewhere in this Complaint.

164.   During the course of their representation of each Plaintiff, in furtherance of the above-described scheme, said Defendants each made numerous knowingly or negligently false affirmative representations, and intentional or negligently misleading omissions of material fact and gave numerous recommendations, advice, instructions, and opinions to each Plaintiff, including, but not limited to, the following:

a.   Planning and implementing a scheme by which Defendants could manipulate their clients, including each Plaintiff, into transferring and/or keeping their assets in UBS AG;

b.   Taking advantage of a relationship of trust and confidence and using their respective and collective knowledge of each Plaintiff's confidential information to solicit him or her to transfer assets to, or otherwise maintain an account with, UBS AG;

c.   Charging and collecting unreasonable, excessive, and unethical fees;

d.   Failing to disclose the QI Agreement and other disclosure and tax requirements;

e.   Breaching the QI Agreement;

f.   Advising each Plaintiff that the investments and transactions were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

g.   Recommending, advising, instructing, and assisting each Plaintiff in the formation of unnecessary business entities and

incurring unnecessary fees and criminal investigation related thereto;

h. Transferring assets to the names of said "shell" entities thereby causing additional unnecessary fees;

i. Promoting and selling unregistered and illegal tax shelters;

j. Failing to obtain and ensure licensure of its bankers and third party affiliates regarding the provision of banking services, investment advice and/or soliciting the purchase or sale of securities through contact with clients in the U.S.;

k. Failing to ensure that the advised transactions complied with applicable federal rules and regulations;

l. Failing to comply with their respective ethical obligations to each Plaintiff and violating their respective professional rules of conduct;

m. Providing erroneous legal and tax opinions and advice;

n. Providing personal financial information as well as erroneous financial information to third parties while maintaining that such information would be held in strict confidence and/or that Each Plaintiff would be advised of any intent to disclose such information; and

o. Permitting or participating in embezzlement.

165. By virtue of the scheme, Defendants either knew or reasonably should have known their representations, recommendations, advice, instructions, and opinions to be false.   In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise each Plaintiff of the omissions set forth above, was intentional, negligent, grossly negligent, and reckless.  Accordingly, said Defendants failed to exercise the requisite standard of care for tax advisers and/or financial advisors.

166.   Each Plaintiff fully performed his or her obligations to Defendants under their respective contracts and, thus, did not contribute to the intentional, negligent, grossly negligent, and/or reckless acts in any way.

167.   In reasonable reliance on Defendants' advice, each Plaintiff paid from tens of thousands to hundreds of thousands of dollars for tax and legal advice, the execution of investment transactions, purchased unnecessary investments to effectuate Defendants' scheme, did not avail themselves of legitimate investments and tax savings opportunities, were subjected to arbitrary and unlawful frozen accounts, and was subjected to criminal investigation in connection with Defendants' scheme.

168.   But for said Defendants' failures to meet their respective applicable standards of care described above, each Plaintiff either would never have transferred their respective assets to UBS AG or maintained their account there, would have never allowed unnecessary investments and transactions, would have never filed improper federal and state tax returns, and otherwise failed to avail themselves of proper investments and tax savings opportunities.

169.   As a result of said Defendants' conduct, each Plaintiff has suffered injury in that each Plaintiff has paid Defendants thousands of dollars, purchased unnecessary investments, suffered unnecessary transactions, had funds converted and/or improperly withheld, incurred severe tax penalties and interest on what amounted to meager tax liabilities, incurred, and continuing to incur, substantial additional costs in hiring new tax and legal advisors to rectify the situation, and otherwise foregone legitimate investment and tax savings opportunities.

170.   As proximate cause of the foregoing, each Plaintiff has been injured in an actual amount to be proven at trial, but at least $1 million dollars, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT X

(Disgorgement of Unethical Excessive & Illegal Fees Against All Defendants; and DOES 1 through 10, inclusive)

171.  Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

172.  Defendants charged each Plaintiff for "management" services of their respective accounts and other necessary "services," including those of third parties, which had no true value and expended little, if any, additional time or effort in providing necessary, useful and/or productive advice, products, opinions and/or services to Each Plaintiff.  These charges were not customary, but were excessive, especially in light of the alleged scheme.  Additionally, said Defendants were not licensed to conduct any of the transactions, give advice, sell, and/or invest his assets.

173.  In addition to the meritless advice, opinions and document preparation provided to each Plaintiff, Defendants' respective fees, which he paid out of his assets, are unethically excessive and in violation of both federal and state statutes.

174.  Moreover, because Defendants did not disclose information they were required to disclose, as provided hereinabove, their fee and/or compensation agreements with each Plaintiff are not enforceable.

175.  Accordingly, all fees, profits, commissions, received by Defendants either directly from each Plaintiff or from any and all other Defendants and/or third parties, in the preparation of and formation of business entities, and "salaries" obtained from entities using the Olen assets, must be disgorged.

## COUNT XI

(Civil Conspiracy Against All Defendants and DOES 1 through 10, inclusive)

176.  Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

177.  Between 2000 and 2010, Defendants engaged in several civil conspiracies with each other which consisted of:

        (a)    an agreement between and amongst Defendants to

(b)     misrepresent to all U.S. customers, including each Plaintiff, and similarly situated existing and prospective customers, the true nature of the investment scheme and to defraud each Plaintiff into paying unnecessary and excessive fees for a fraudulent product and fraudulent services and to convert assets from each Plaintiff,

(c) which agreement resulted in injury to each Plaintiff.

178.   As previously described in detail above, Defendants knowingly acted in concert to market and implement the fraudulent and manipulative scheme. In doing so, Defendants acted with full knowledge and awareness that the concealment of information, asset transfers, investments, entity formations and unauthorized transfers were designed to give the false impression that a well-planned and complex series of transactions were legitimate business transactions which had economic substance from a tax-savings, privacy and investment standpoint, when in fact they lacked those and other features necessary for a successful tax and investment strategy and were further in direct contravention to the QI Agreement and designed to skirt each Plaintiff's best interests for their collective gain.

179.   Prior to the marketing and consummation of the asset transfers and/or account maintenance and investment scheme, Defendants entered into an agreement, association and union associated, in fact, to devise, design, facilitate, promote, and manage the asset transfers and investments of each Plaintiff for the express purpose of generating and sharing in millions of dollars in fees and converted monies.

180.   Not only did Defendants know that their expressly marketed strategies were abusive and illegal tax shelters, but they expressly stated to each Plaintiff that the transactions were going to net each Plaintiff better investment results while providing additional privacy and security. This was patently false as the Defendants knew.

181.   Defendants further knew, or were reckless in not knowing, that they were charging each Plaintiff excessive, unnecessary and/or imaginary fees for all transactions conducted, as described above.

182.   The acts of the Defendants violated both federal and state law, as well as rules governing professional standards.

183.   The Defendants acted in their respective roles as described above according to a predetermined and commonly understood and accepted plan of action all for the sole purposes of obtaining professional fees and converting monies from each Plaintiff, and other customers, all in contravention to the QI Agreement and/or U.S. Tax laws.

184.   As co-conspirators, each of the Defendants, and DOES 1 through 10, during the previously-described time periods, aided the other in the implementation and execution of said Defendants' joint deceptive scheme by causing each Plaintiff to invest their funds with them and/or by taking advantage of their powers over said funds.   A meeting of the minds existed between and amongst said Defendants to commit the unlawful acts alleged herein.   These conspiracies to commit said unlawful, overt acts, proximately caused and continue to cause each Plaintiff damages as previously set forth herein.

185.   As a consequence of Defendants' conduct, each Plaintiff has suffered injury to himself, the business and assets in that each has paid Defendants hundreds of thousands of dollars in fees and actual damages and losses in an amount to be proven at trial; has incurred tax penalties and interest and disallowance of certain other deductions; has incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; has foregone legitimate tax savings and investment opportunities; has been criminally investigated by the Department of Justice; and has suffered, and will continue to suffer,  relentless negative press causing each of them and their respective families great personal and professional embarrassment and effecting their business reputation and opportunities.

1      186.  Each Plaintiff has been injured in an actual amount to be proven at
2 trial, but at least $1 million dollars as to all Defendants, and should be awarded punitive
3 damages in accordance with the evidence, plus attorneys' fees and costs.

### COUNT XII

5 (Unfair Business Practices Act, Cal. B&P Code §17200, et. seq., by Plaintiffs Nadia and
6 Sean Roberts Against All Defendants; and DOES 1 through 10, inclusive)

7      187.  Plaintiffs repeat and reallege each and every prior allegation, as if
8 fully set forth herein.

9      188.  Based on the wrongful act of Defendants, and DOES 1 through 10,
10 and each of them, as set forth full in the factual allegations above and incorporated
11 herein by this reference, both against each California Plaintiff and in violation of federal
12 and state laws, each Plaintiff has suffered, and will continue to suffer, substantial
13 pecuniary losses as well as irreparable injury to each Plaintiff's business reputation and
14 goodwill.

15      189.  By reason of said wrongful acts, including, but not limited to, fraud,
16 embezzlement and securities fraud, said Defendants have violated California Business &
17 Professions Code § 17200, et seq., by consummating an unlawful, unfair, and fraudulent
18 business practice designed to deprive each Plaintiff of money and investment profits.
19 More specifically, Defendants engaged in the following:

20      a. Embezzlement by the UBS AG Defendants and their third party co-
21      conspirators continuously and repeatedly between 2000 and 2010;

22      b. Fraudulent misrepresentation and concealment by the previously
23      described individuals on behalf of UBS AG continuously and repeatedly
24      between 2000 and 2010 relating to fund management, tax legalities,
25      liabilities, and filing requirements, privacy, quality of securities, true
26      price of securities, and true use of assets;

27      c. Securities fraud continuously and repeatedly between 2000 and 2010,
28      including intentional statutory and governmental violations of selling

securities without proper licensure, and ignoring non-licensure of employees and third party securities promoters.

190.   Accordingly, each California Plaintiff is entitled to restitution in an amount to be proven at trial, but at least $1 million dollars as to all Defendants.

## COUNT XIII

(Violation of the Texas Deceptive Practices Act,

Tex. Bus. & Com. Code §§17.41, et. seq., by the Gubsers ,

Against All Defendants; and DOES 1 through 10, inclusive)

191.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

192.   Based on the wrongful act of Defendants, and DOES 1 through 10, and each of them, as set forth full in the factual allegations above and incorporated herein by this reference, both against each Texas Plaintiff and in violation of federal and state laws, each Plaintiff has suffered, and will continue to suffer, substantial pecuniary losses as well as irreparable injury to each Plaintiff's business reputation and goodwill.

193.   By reason of said wrongful acts, including, but not limited to, fraud, embezzlement and securities fraud, said Defendants have violated Tex. Bus. & Com. Code §§17.41, et. seq., by consummating an unlawful, unfair, and fraudulent business practice designed to deprive each Plaintiff of money and investment profits.   More specifically, Defendants engaged in the following:

a. Embezzlement by the UBS AG Defendants and their third party co-conspirators continuously and repeatedly between 2000 and 2010;

b. Fraudulent misrepresentation and concealment by the previously described individuals on behalf of UBS AG continuously and repeatedly between 2000 and 2010 relating to fund management, tax legalities, liabilities, and filing requirements, privacy, quality of securities, true price of securities, and true use of assets;

1
2
3
4

      c. Securities fraud continuously and repeatedly between 2000 and 2010, including intentional statutory and governmental violations of selling securities without proper licensure, and ignoring non-licensure of employees and third party securities promoters.

5
6

    194.   Accordingly, each Texas Plaintiff is entitled to restitution in an amount to be proven at trial, but at least $1 million dollars as to all Defendants.

7

**COUNT XIV**

8
9
10

(Violation of N.Y. Gen. Bus. Law § 349, et. seq., Deceptive Acts and Practices Unlawful, by Anton Ginzburg and Jeffrey Chernick Against All Defendants; and DOES 1 through 10, inclusive)

11
12

    195.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

13
14
15
16
17
18

    196.   Based on the wrongful act of Defendants, and DOES 1 through 10, and each of them, as set forth full in the factual allegations above and incorporated herein by this reference, both against each New York Plaintiff and in violation of federal and state laws, each Plaintiff has suffered, and will continue to suffer, substantial pecuniary losses as well as irreparable injury to each Plaintiff's business reputation and goodwill.

19
20
21
22
23

    197.   By reason of said wrongful acts, including, but not limited to, fraud, embezzlement and securities fraud, said Defendants have N.Y. Gen. Bus. Law § 349, et. seq., by consummating an unlawful, unfair, and fraudulent business practice designed to deprive each Plaintiff of money and investment profits.  More specifically, Defendants engaged in the following:

24
25

      a. Embezzlement by the UBS AG Defendants and their third party co-conspirators continuously and repeatedly between 2000 and 2010;

26
27
28

      b. Fraudulent misrepresentation and concealment by the previously described individuals on behalf of UBS AG continuously and repeatedly between 2000 and 2010 relating to fund management, tax legalities,

- 61 -

**COMPLAINT**

1
2

        liabilities, and filing requirements, privacy, quality of securities, true price of securities, and true use of assets;

3
4
5
6

    c. Securities fraud continuously and repeatedly between 2000 and 2010, including intentional statutory and governmental violations of selling securities without proper licensure, and ignoring non-licensure of employees and third party securities promoters.

7
8

      198. Accordingly, each New York Plaintiff is entitled to restitution in an amount to be proven at trial, but at least $1 million dollars as to all Defendants.

9

## COUNT XV

10
11

(Unfair Business Practices, Rev.Code.Wash. §19.86.020, et. seq., by Arthur Joël Eisenberg Against All Defendants; and DOES 1 through 10, inclusive)

12
13

      199. Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

14
15
16
17
18
19

      200. Based on the wrongful act of Defendants, and DOES 1 through 10, and each of them, as set forth full in the factual allegations above and incorporated herein by this reference, both against each Washington Plaintiff and in violation of federal and state laws, each Plaintiff has suffered, and will continue to suffer, substantial pecuniary losses as well as irreparable injury to each Plaintiff's business reputation and goodwill.

20
21
22
23
24

      201. By reason of said wrongful acts, including, but not limited to, fraud, embezzlement and securities fraud, said Defendants have violated Rev.Code.Wash. §19.86.020, et. seq., by consummating an unlawful, unfair, and fraudulent business practice designed to deprive Each Plaintiff of money and investment profits. More specifically, Defendants engaged in the following:

25
26

    a. Embezzlement by the UBS AG Defendants and their third party co-conspirators continuously and repeatedly between 2000 and 2010;

27
28

    b. Fraudulent misrepresentation and concealment by the previously described individuals on behalf of UBS AG continuously and repeatedly

1    between 2000 and 2010 relating to fund management, tax legalities,

2    liabilities, and filing requirements, privacy, quality of securities, true

3    price of securities, and true use of assets;

4    c. Securities fraud continuously and repeatedly between 2000 and 2010,

5    including intentional statutory and governmental violations of selling

6    securities without proper licensure, and ignoring non-licensure of

7    employees and third party securities promoters.

8    202.  Accordingly, each Washington Plaintiff is entitled to restitution in an

9  amount to be proven at trial, but at least $1 million dollars as to all Defendants.

10                           **COUNT XVI**

11    (Breach of Contract Against the UBS AG Defendants; and DOES 1 through 10,

12                             inclusive)

13     203.  Plaintiffs repeat and reallege each and every prior allegation, as if

14   fully set forth herein.

15     204.  Each Plaintiff entered into implied, oral and written contracts with

16   Defendants to provide him with professionally competent investment advisory and

17   execution services, tax and legal advice and services, and accounting services.  In

18   connection therewith, Defendants were required and expected to meet all applicable

19   standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with

20   all applicable rules of professional conduct.  Moreover, as previously stated, each

21   Plaintiff gave specific guidelines regarding the quality of investment vehicles and the

22   overall goals for growth, and that parties agreed that any fees paid would be based on a

23   "transparent system" and that each Plaintiff would only be charged a periodic fee.

24     205.  Defendants ignored their obligations and each Plaintiff's guidelines

25   and instead materially breached their contracts by, among other things, providing each

26   Plaintiff with advice, opinions, recommendations, representations, instructions, and

27   services that Defendants either knew or reasonably should have known to be wrong and

28   in furtherance of the conduct described above.  Additionally, the rendering of such

1  advice, opinions, recommendations, representations, instructions and services was
2  intentional, negligent, grossly negligent and reckless.  Each Plaintiff further believes and
3  thereon alleges, that Defendants charged each Plaintiff fees, costs, and expenses that
4  were not chargeable or agreed to by each Plaintiff.  Accordingly, Defendants failed to
5  exercise the standard of care required of them and materially breached their contracts
6  with each Plaintiff.  Alternatively, to the extent that no express contract existed for the
7  services described herein, each Plaintiff has been damaged under the theory of implied
8  contract.

9       206.  Each Plaintiff fully performed his obligations to Defendants under
10  these contracts and did not contribute to Defendants' material breaches in any way.

11       207.  As a result of said material breaches, each Plaintiff has suffered
12  injuries in that each Plaintiff has suffered injury to his or her business and assets in that
13  each Plaintiff has paid Defendants tens of thousands of dollars in fees and actual
14  damages and losses in an amount to be proven at trial; has incurred tax penalties and
15  interest and disallowance of certain other deductions on what amounted to meager tax
16  liability; has incurred and will continue to incur substantial additional fees and costs in
17  hiring new tax and legal advisors to rectify the situation; has foregone legitimate tax
18  savings and investment opportunities; has been criminally investigated by the
19  Department of Justice; and has suffered, and will continue to suffer, weekly relentless
20  press causing him and his family great embarrassment and effecting his business
21  reputation.

22       208.  By reason of the foregoing, each Plaintiff is entitled to recover actual
23  damages, including prejudgment interest, plus attorneys' fees and costs.

24                    **COUNT XVII**

25       (Conversion Against All Defendants; and DOES 1 through 10, inclusive)

26       209.  Plaintiffs repeat and reallege each and every prior allegation, as if
27  fully set forth herein.

28

210.   Defendants wrongfully interfered with each Plaintiff's interests in his investment assets by undertaking the following acts:

    a.   Defendants UBS AG, charged thousands of dollars in excessive and unauthorized fees against each Plaintiff's accounts;

    b.   Defendants UBS AG and its co-conspirators created unnecessary "shell" corporations and/or charged unnecessary transaction fees and referral fees to all parties involved;

    c.   Defendants, and each of them, wrongfully froze accounts and otherwise charged improper "fees" upon closing each Plaintiff's account and transferring the funds back to each Plaintiff.

211.   Defendants conspired with each other to convert the above-listed property, so that the activities of one are attributable to all.

212.   As a result of Defendants' acts of conversion, each Plaintiff has been damaged in an amount to be proven at trial, but at least $1,000,000 as to all Defendants, including all compensatory damages.

213.   In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in conscious disregard of the rights of each Plaintiff, and each Plaintiff is therefore entitled to punitive damages according to proof at the time of trial.

214.   Each Plaintiff is further entitled to the imposition of a constructive trust on the converted assets and their fruits and is entitled to a tracing and accounting with respect to said funds.

215.   Each Plaintiff is further entitled to the imposition of an equitable lien on the converted goods.

## COUNT XVIII

(Breach of Confidentiality by the Roberts, Ginzburg, Eisenberg and Chernick Against the UBS AG Defendants; and DOES 1 through 10, inclusive)

216.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

217.   Defendants violated Swiss Civil Code, Article 28 and Swiss Banking Law, Article 47 which prohibits a bank and any bank representative from revealing a customer's private information to any third party. While there are exceptions to these codes, the facts as it pertained to the allegations against Plaintiffs Nadia and Sean Roberts, Ginzburg, Eisenberg, and Chernick did not give rise to the exception.

218.   Moreover, UBS AG created its own list of threshold items which would trigger the release of a U.S. customer's name to third parties, such as the DOJ. Unfortunately, UBS AG did not follow its own standard when it released the names of specific customers.

219.   Consequently, each of the aforementioned Plaintiffs was not able to apply for voluntary disclosure being afforded by the IRS. In fact, UBS AG released these names before any of these Plaintiffs had even been made aware of the Voluntary Disclosure program. While said Plaintiffs would still have been penalized, the penalties under the Voluntary Disclosure program were and continue to be much less severe, which would have saved each Plaintiff millions of dollars in penalties and interest.

## COUNT XIX

(Accounting Against the UBS AG Defendants; and DOES 1 through 10, inclusive)

220.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

221.   As a result of the foregoing breaches, conversions, unnecessary fees, and unauthorized transactions, Defendants have received money, a portion of which is still due to each Plaintiff.

**COMPLAINT**

222.   However, the amount of money due cannot be ascertained and/or verified without an accounting, i.e., transaction statements, receipts, ledgers, as they pertain to, *inter alia*, investments, trusts, purchases, entity formations, fraudulent salaries, referrals, and related fees and costs.  As such, each Plaintiff cannot even verify account fees and/or that transactions were conducted pursuant to the agreements and his guidelines.

223.   Each Plaintiff is informed and believes and thereon alleges that the amount due and owing is in excess of $100 Thousand dollars.

224.   Each Plaintiff has repeatedly demanded accountings of all aforementioned transactions from Defendants and payment of all amounts due; however, Defendants have failed and refused, and continue to fail and refuse, to provide such accountings and pay such sums.

## COUNT XX

(Declaratory Relief Against All Defendants; and DOES 1 through 10, inclusive)

225.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

226.   The IRS audited each Plaintiff's tax returns regarding the above-described transactions.  As a result, each Plaintiff incurred and continues to incur professional fees and expenses, and other costs, rectifying Defendants' wrongdoing.

227.   Defendants are legally responsible for:

   a.   Interest and/or tax penalties assessed by the IRS and/or state tax authorities;

   b.   Professional fees and costs incurred by each Plaintiff in connection with federal and/or state investigations and audits; and

   c.   Professional fees and expenses incurred by each Plaintiff on account of Defendants' violations of law and other actionable conduct.

228. Pursuant to 28 U.S.C. § 2201, each Plaintiff is entitled to a declaration that Defendants are liable to him for such penalties, interest, costs, professional fees, expenses and damages. There exists an actual, justiciable controversy between the parties as Defendants have denied such liability.

229. Pursuant to 28 U.S.C. § 2201, each Plaintiff is also entitled to a declaration that the agreements entered into with Defendants are void and unenforceable and are, in any event, inapplicable in all respects to the claims asserted herein.

**JURY DEMAND**

Plaintiffs herein demand trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, each Plaintiff demands judgment against all Defendants, and each of them, as follows:

**AS TO COUNTS I THROUGH XVIII:**

1.   For rescission of any and all contracts, plus all compensatory damages proximately caused by the wrongful acts and/or omissions of each defendant

2.   For reasonable attorney's fees and costs pursuant to California Corporations Code § 25501.5, et seq., where applicable;

3.   For exemplary and punitive damages in an amount to be proven at trial;

4.   For the disgorgement of all fees paid to each of the Defendants for all transactions according to proof, but no less than $1 million per Plaintiff;

5.   For restitution of all monies converted by all Defendants, plus all fees paid for services, in an amount to be determined at trial, but at least $100 Thousand dollars as to each Plaintiff;

6.   For compensatory damages for lost investment opportunities in amount to be determined at trial, but not less than $100,000 per Plaintiff;

7. For compensatory damages in accordance with Swiss Civil Code Article 28 as to each of Plaintiffs Nadia and Sean Roberts, Ginzburg, Eisenberg, and Chernick in an amount to be determined at trial, but at least $1 million per Plaintiff;

**AS TO COUNT XIX:**

8. For an order requiring Defendants UBS AG to provide a full and complete accounting of all transactions, all fees charged, and all commissions paid;

**AS TO COUNT XX:**

9. For a declaration that, pursuant to 28 U.S.C. § 2201, each Plaintiff is entitled to a declaration that each defendant is jointly and severally liable to him or her for all tax penalties, interest, costs, professional fees, expenses and damages related to the tax assessments levied against each Plaintiff;

**AS TO ALL COUNTS:**

10. For attorneys fees as permitted by statute;

11. For costs of suit incurred herein; and

12. For such other and further relief as the court may deem proper.

DATED: May 3, 2012

<u>**RESPECTFULLY SUBMITTED,**</u>

_/s/ William J. King_____
William J. King, Esq. (Bar No. 199908)
THE WJK LAW FIRM, P.C.
1432 Edinger Ave., Suite 200
Tustin, California 92780
T: (714) 640-6029
F: (714) 640-6843
Email: wking@wjkLawFirm.com

- 69 -