1
2
3
4
5
6
7
8
9        **IN THE UNITED STATES DISTRICT COURT**

10        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11
12
NADIA ROBERTS, et al.,                          CASE NO. CV F 12-0724 LJO SKO
13
                           Plaintiffs,          **ORDER ON DEFENDANT UBS AG'S**
14                                              **F.R.Civ.P. 12 MOTION TO DISMISS**
        vs.                                     (Doc. 38.)
15
UBS AG, et al.,
16
                           Defendants.
17
_____/
18
19                  **PRELIMINARY STATEMENT TO PARTIES AND COUNSEL**

20        Judges in the Eastern District of California carry the heaviest caseload in the nation, and this

21  Court is unable to devote inordinate time and resources to individual cases and matters.  This Court

22  cannot address all arguments, evidence and matters raised by parties and addresses only the arguments,

23  evidence and matters necessary to reach the decision in this order given the shortage of district judges

24  and staff.  The parties and counsel are encouraged to contact United States Senators Diane Feinstein and

25  Barbara Boxer to address this Court's inability to accommodate the parties and this action.  The parties

26  are required to consider, or reconsider, consent to a U.S. Magistrate Judge to conduct all further

27  proceedings in that the Magistrate Judges' availability is far more realistic and accommodating to parties

28  than that of U.S. District Judge Lawrence J. O'Neill who must prioritize criminal and older civil cases.

                                              1

1

2      Civil trials set before Judge O'Neill trail until he becomes available and are subject to suspension

3    mid-trial to accommodate criminal matters.  Civil trials are no longer reset to a later date if Judge O'Neill

4    is unavailable on the original date set for trial.  If a trial trails, it may proceed with little advance notice,

5    and the parties and counsel may be expected to proceed to trial with less than 24 hours notice.

6    Moreover, this Court's Fresno Division randomly and without advance notice reassigns civil actions to

7    U.S. District Judges throughout the nation to serve as visiting judges.  This action is under consideration

8    for such reassignment.  In the absence of Magistrate Judge consent, this action is subject to reassignment

9    to a U.S. District Judge from outside the Eastern District of California.

10                                              **INTRODUCTION**

11      Defendant UBS AG seeks to dismiss as improperly pled and legally barred plaintiffs'[1] fraud,

12   malpractice and related claims arising from tax penalties plaintiffs incurred in connection with foreign

13   investments and tax shelters with defendant UBS AG.  Plaintiffs contend that their operative Second

14   Amended Complaint ("SAC") allege facts "to show that Plaintiffs are entitled to relief from UBS AG."

15   This Court considered UBS AG's F.R.Civ.P. 12(b)(6) motion to dismiss on the record and VACATES

16   the April 17, 2013 hearing, pursuant to Local Rule 230(g).  For the reasons discussed below, this Court

17   DISMISSES the SAC's claims, except limited negligence and conversion claims.

18                                              **BACKGROUND**[2]

19                                                **Summary**

20      UBS AG is a Swiss corporation, provides banking and investment services, and operates

21   worldwide branches.  The SAC also names as defendants four individuals associated with UBS AG,

22   three Swiss business entities, two private Swiss banks, and a Bermuda corporation.[3]  The individual

23   _____

24        [1]      Plaintiffs are Nadia and Sean Roberts (the "Roberts"), Bernhard and Heidi Gubser (the "Gubsers"), Anton
25   Ginzburg ("Mr. Ginzburg"), Arthur Joel Eisenberg ("Mr. Eisenberg"), Jeffrey Chernick ("Mr. Chernick") and Mr. Chernick's
     Liberian corporation Shumba and Hong Kong corporation Simba, and all plaintiffs will be referred to collectively as
26   "plaintiffs."

27        [2]      The factual recitation summarizes the SAC and is derived from other matters which this Court may
     consider.

28        [3]      These defendants and UBS AG will be referred to collectively as "defendants."

1  plaintiffs are residents of California, Texas, Washington and New York and are former UBS AG clients.

2  The SAC alleges that UBS AG induced plaintiffs to transfer accounts to or to keep accounts with UBS

3  AG and concealed U.S. tax reporting requirements to result in plaintiffs' failure to pay U.S. taxes on

4  their UBS AG foreign investments and consequent penalties.  The SAC alleges that each plaintiff "faced

5  criminal investigation relating to the shell company structure set up and carried out by Defendants" and

6  "agreed to pay millions of dollars in tax penalties, plus interest, on top of related costs and professional

7  fees."  UBS AG challenges the SAC's multiple tort and related claims as lacking sufficient facts and as

8  barred by plaintiffs' own conduct.

9  **IRS Foreign Account And Trust Reporting**

10      Internal Revenue Service ("IRS") Form 1040, Schedule B, Line 7a ("Line 7a") asks: "did you

11  have a financial interest in or signature authority over a financial account (such as a bank account,

12  securities account, or brokerage account) located in a foreign country?"  Schedule B indicates that if a

13  taxpayer has a foreign account, the taxpayer generally must identify the account's location and complete

14  IRS Form TD F 90-22.1 known as the Report of Foreign Bank and Financial Accounts ("FBAR").

15  FBAR instructions require a taxpayer to file a FBAR if the taxpayer has more than $10,000 in foreign

16  accounts and to disclose maximum account values and financial institutions holding accounts.

17  **UBS AG's Scheme**

18      In 2001, the U.S. Treasury required UBS AG to enter into a Qualified Intermediary ("QI")

19  Agreement to require UBS AG clients to complete Internal Revenue Service ("IRS") Forms W-8BEN

20  or W-9 to identify beneficial account owners believed or known to be U.S. citizens or residents.[4]

21  According to the SAC, "UBS AG informed the IRS that it would agree to the QI Agreement terms while

22  devising a scheme to avoid doing just that and would conceal from its clients the QI terms pertaining

23  to said clients while failing to provide necessary documentation to keep its clients, including Plaintiffs,

24  in compliance with U.S. Tax Laws."

25  / / /

26

27      [4]      UBS AG notes that the IRS established the QI Program to require financial institutions to identify and
    withhold tax on U.S. source income paid to foreign bank accounts, including income generated by U.S. securities, real estate

28  and other investments.  UBS AG further notes that the QI Agreement "does not create any obligations in favor of
    accountholders."

3

1 / / /

2 **Execution Of The Scheme As To Plaintiffs**

3 *The Roberts*

4   The Roberts are married.  In 2004, Sean Roberts ("Mr. Roberts") owned a UBS AG account in

5 the Isle of Mann and UBS AG banker Claude Ullman ("Mr. Ullman") convinced Mr. Roberts to transfer

6 his account to UBS AG's Swiss location.  In 2004, Mr. Ullman told Mr. Roberts that Mr. Roberts could

7 set up a third party trust "to keep his money in a confidential account without having to report it on his

8 taxes because the new entity would be the beneficiary."   UBS AG hired defendant Beda Singenberger

9 ("Mr. Singenberger") to create a third-party trust for the Roberts but UBS AG, Mr. Ullman and Mr.

10 Singenberger failed to advise the Roberts "of the illegal nature of said third party trust" and of UBS

11 AG's and the Roberts' tax reporting obligations regarding the trust.

12   In June 2011, the Roberts entered into plea agreements to plead guilty to filing a false tax return.

13 *The Gubsers*

14   The Gubsers were married during 1978-2008 and held a Swiss UBS AG account which they

15 allowed to sit and which grew to $5.5 million.  UBS AG banker Gerard Hofmann ("Mr. Hofmann")

16 advised the Gubsers that the account was set up so that the Gubsers would not need to pay taxes or

17 disclose the account until they brought funds into the United States.  UBS AG never advised the Gubsers

18 that they were required to file an IRS Form W-8BEN and "intentionally withheld information pertaining

19 to the QI Agreement."  In December 2010, the Gubsers "realized that they may be subject to prosecution

20 by the IRS for failing to declare a 40-year old account originating in Switzerland."   The Gubsers

21 participated in the Voluntary Disclosure program and "were forced to pay penalties they should not have

22 paid."

23 *Mr. Ginzburg*

24   In 2000, UBS AG banker Gian Gisler ("Mr. Gisler") advised Mr. Ginzburg, a medical

25 professional, to change the structure of Mr. Ginzburg's UBS AG funds.  Mr. Gisler, defendant Matthias

26 Rickenbach ("Mr. Rickenbach"), a Swiss citizen, and UBS AG director Daniel Perron ("Mr. Perron")

27 advised Mr. Ginzburg to close a Liechtenstein-based trust structure and to open a Hong Kong-based

28 trust, that Mr. Ginzburg "would not have to pay any taxes on any capital gains or dividends until the

1    funds were repatriated" to Mr. Ginzburg's future domicile, the United States or Israel, and that he would

2    pay only taxes on possible capital gains and dividends when he repatriated the funds.  Mr. Ginzburg

3    allowed Mr. Rickenbach to set up the Hong Kong trust, and "his account was invested in U.S. stocks"

4    despite UBS AG's agreement to report income and to withhold taxes.  Mr. Ginzburg was never informed

5    of the QI Agreement, and in November 2008, UBS AG froze his accounts to prevent him to mitigate

6    market losses.  UBS AG representatives refused to disclose information about Mr. Ginzburg's accounts

7    and without Mr. Ginzburg's authorization, "forcefully liquidated the stock portfolio at 2009 levels" to

8    result in a $1.5 million loss.  A $565,000 "sales tax" was "wrongfully withheld without any benefit" to

9    Mr. Ginzburg.

10          In July 2011, Mr. Ginzburg pled guilty to criminal tax fraud.

11                                      *Mr. Eisenberg*

12          Mr. Eisenberg held a UBS AG account in the Grand Caymans and during a vacation there,

13    entered a UBS AG branch to inquire about the account.  He was informed that his account was on the

14    "abandoned accounts" list and transferred to Switzerland.  In 2001, Mr. Eisenberg traveled to

15    Switzerland, and defendant UBS AG regional market manager Hansredi Schumacher ("Mr.

16    Schumacher") advised Mr. Eisenberg to set up a trust account.  Mr. Eisenberg permitted Mr.

17    Schumacher to set up a Liechtenstein trust and was advised "that he would legally not be required to

18    disclose his account to the IRS because of the trust formation."  In 2010, Mr. Eisenberg discovered that

19    UBS AG double charged fees during the account's life.

20          UBS AG failed to advise Mr. Eisenberg of release by UBS AG of his name to the United States

21    to preclude Mr. Eisenberg to correct defects or seek voluntary disclosure.  Mr. Eisenberg's name was

22    one of the first released to the IRS.

23          The IRS prosecuted Mr. Eisenberg who entered into a December 2010 agreement to plead guilty

24    to filing a false tax return and paid $2.5 million penalties on a $65,000 tax bill.

25                              *Mr. Chernick, Shumba And Simba*

26          Mr. Chernick succeeded in manufacturing toys with his Shumba corporation.  In 2000, UBS AG

27    executive director Phillip Bigger ("Mr. Bigger") recommended to move Mr. Chernick's Cayman Islands

28    account to UBS AG's Hong Kong office, and Mr. Chernick opened up UBS AG Hong Kong accounts

under Shumba.  Mr. Bigger advised Mr. Chernick that Mr. Chernick would legally not be required to report the account on his taxes.

In 2001, UBS AG account advisor Juergen Hirsch ("Mr. Hirsch") managed Mr. Chernick's Hong Kong account and advised Mr. Chernick to hold U.S. securities in the Hong Kong accounts "without disclosing that Chernick would have to report such holdings to the U.S. or otherwise advising him of the QI Agreement terms."  In 2002, defendant Mr. Rickenbach with UBS AG's authorization "caused the setup of a sham entity to hold Shumba and Simba."  In 2006, Mr. Bigger caused Mr. Chernick to close his Shumba account at UBS AG's Hong Kong office and transferred the account's assets, including U.S. securities, to a UBS AG Zurich account.  Mr. Bigger failed to inform Mr. Chernick of QI Agreement requirements to file IRS forms or UBS AG withholding of taxes.

Mr. Chernick entered into a July 2009 agreement to plead guilty to filing a false tax return.

### *Common Allegations*

As to all plaintiffs, the SAC alleges that USB AG agents, financial and account advisors, executive directors, and bankers, "under the direction of USB AG":

1. Concealed the QI Agreement and need for UBS AG to withhold taxes or send IRS reporting forms;

2. Failed to include on plaintiffs' statement "tax withholding";

3. Failed to send plaintiffs IRS Forms 1099, W-9 or W-8BEN;

4. Failed to advise plaintiffs "that their accounts were set up in violation of the QI Agreement and U.S. tax codes, and that said plaintiffs needed to take steps to advise the IRS of said third-party trusts";

5. Failed to send an amnesty letter to advise plaintiffs of the option to disclose to the United States their UBS AG accounts through a "Voluntary Disclosure" program;

6. Violated UBS AG protocols and Swiss laws on disclosure of client identities;

7. Were not properly licensed to provide banking services and tax and investment advice and solicited and serviced plaintiffs "in violation of U.S. securities laws"; and

8. Failed to register themselves and offered securities to violate federal law.

### Criminal Prosecution Of UBS AG And Plaintiffs

1    In November 2008, the United States government filed indictments against UBS AG executives,

2  managers and bankers.  On February 18, 2009, UBS AG and the United States government entered into

3  a Deferred Prosecution Agreement ("DPA") by which UBS AG admitted that during 2000-2007, UBS

4  AG "participated in a scheme to defraud the United States and its agency, the IRS by actively assisting

5  or otherwise facilitating a number of United States individual taxpayers in establishing accounts at UBS

6  in a manner designed to conceal the United States taxpayers' ownership or beneficial interest in these

7  accounts."  On August 12, 2009, the United States government and UBS AG reached an agreement in

8  principle to disclose 4,450 UBS AG clients.

9    By 2010, the IRS and U.S. Department of Justice had approached each plaintiff and advised that

10  investments since 2001 were subject to taxation.  Each plaintiff faced criminal investigation and paid

11  millions of dollars in tax penalties in addition to interest and professional fees.

12  **DISCUSSION**

13  **F.R.Civ.P. 12(b)(6) Motion To Dismiss Standards**

14    The FAC alleges 15 tort and related claims which UBS AG contends are precluded by plaintiffs'

15  "own tax fraud" in that all plaintiffs but the Gubsers have pled guilty to tax fraud by knowingly filing

16  false tax returns and concealing income.  UBS AG holds plaintiffs to "the burden of their own tax fraud"

17  and faults the SAC's failure to plead sufficient facts to support its claims.

18    "When a federal court reviews the sufficiency of a complaint, before the reception of any

19  evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not whether

20  a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the

21  claims."  *Scheurer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974); *Gilligan v. Jamco Development

22  Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).  A F.R.Civ.P. 12(b)(6) dismissal is proper where there is either

23  a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal

24  theory."  *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Graehling v. Village of

25  Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995).  A F.R.Civ.P. 12(b)(6) motion "tests the legal sufficiency

26  of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

27    In addressing dismissal, a court must:  (1) construe the complaint in the light most favorable to

28  the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff

can prove any set of facts to support a claim that would merit relief. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-338 (9th Cir. 1996). Nonetheless, a court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Securities Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). A court "need not assume the truth of legal conclusions cast in the form of factual allegations," *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643, n. 2 (9th Cir.1986), and must not "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated . . . laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897 (1983). A court need not permit an attempt to amend if "it is clear that the complaint could not be saved by an amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

A plaintiff is obliged "to provide the 'grounds' of his 'entitlement to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554,127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, a complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937,1949 (2009), the U.S. Supreme Court explained:

> . . . a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. (Citations omitted.)

After discussing *Iqbal*, the Ninth Circuit summarized: "In sum, for a complaint to survive [dismissal], the non-conclusory 'factual content,' and reasonable inferences from that content, must be

8

plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 989 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. 662, 129 S.Ct. at 1949).

The U.S. Supreme Court applies a "two-prong approach" to address dismissal:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 556 U.S. 662, 129 S.Ct. at 1949-1950.

A plaintiff suing multiple defendants "must allege the basis of his claim against each defendant to satisfy Federal Rule of Civil Procedure 8(a)(2), which requires a short and plain statement of the claim to put defendants on sufficient notice of the allegations against them." *Gauvin v. Trombatore*, 682 F.Supp. 1067, 1071 (N.D. Cal. 1988). "Specific identification of the parties to the activities alleged by the plaintiffs is required in this action to enable the defendant to plead intelligently." *Van Dyke Ford, Inc. v. Ford Motor Co.,* 399 F.Supp. 277, 284 (D. Wis. 1975).

With these standards in mind, this Court turns to UBS AG's challenges to the SAC claims.

## **Fraud**

UBS AG seeks dismissal of the SAC's (first) fraudulent misrepresentation and concealment, (second) constructive fraud, and (third) negligent misrepresentation claims as barred by plaintiffs' own fraud and lacking facts to support elements of the fraud claims.

To support the fraud claims, the SAC alleges that the "UBS AG Defendants":[5]

1.   Prepared documentation to form shell corporations which was not permissible under the QI Agreement or U.S. tax laws;

---

[5]   The "UBS AG Defendants" include UBS AG and most of the 10 other defendants named in the SAC.

9

2.      Represented that plaintiffs need not be named as signatories on accounts to maintain privacy and failed to report each plaintiff's information to the IRS;

3.      Created and implemented a scheme that was illegal and not permitted by the QI Agreement;

4.      Provided erroneous tax and legal advice and intentionally prepared wrongful and misleading documents and sent them to plaintiffs;

5.      Concealed that plaintiffs owed taxes on their investments and faced criminal investigation for the management structure of plaintiffs' account set up by the UBS AG Defendants;

6.      Were not licensed and permitted to provide banking services, investment advice, manage funds, and solicit securities transactions to plaintiffs;

7.      Formed shell corporations and invested in corporations using plaintiffs' assets without advising plaintiffs; and

8.      Manipulated plaintiffs to open or maintain accounts, charged unnecessary fees and converted assets.

### *Bar Of Plaintiffs' Own Fraud*

UBS AG initially challenges the complaint's fraud claims as barred by plaintiffs' own fraud. UBS AG points to *Olenicoff v. UBS AG*, 2012 WL 1192911, at *1 (C.D. Cal. 2012), where the plaintiff pursued claims against UBS AG after the plaintiff pled guilty to knowingly and willfully failing to disclose off-shore accounts on his tax returns. The fellow district judge in *Olenicoff*, 2012 WL 1192911, at *1, observed:

> To defend itself, UBS is forced to strenuously insist that its prior guilty plea only admitted to assisting willing clients with tax fraud, not forcing unsuspecting clients into tax evasion. While its argument is ironic, UBS is right. Even assuming that UBS gave [plaintiff] fraudulent tax advice, that makes UBS a co-conspirator, not a defendant in this litigation.

In *Thomas v. UBS AG*, 706 F.3d 846, 850 (7th Cir. 2013), the Seventh Circuit Court of Appeals addressed fraud claims against UBS AG similar to those here and observed that the "plaintiffs are tax cheats, and it is very odd, to say the least, for tax cheats to seek to recover their penalties . . . from the source, in this case, UBS, of the income concealed from the IRS." As to fraud, the *Thomas* court further

10

1   explained:

2           The plaintiffs also charge fraud: that the bank inveigled them into continuing to
        invest with it (they had opened their accounts before the bank joined the Qualified
3       Intermediary Program) by concealing its agreement with the IRS and the obligation
        entailed by the agreement to report tax information about the plaintiffs to the IRS. This
4       is a private-entrapment argument: by letting the plaintiffs think that keeping their money
        in foreign accounts would enable them to evade federal tax law successfully, UBS caused
5       the plaintiffs to commit tax fraud. That is another frivolous theory of liability. For if it
        were adopted, not only would everyone have a legally enforceable duty to prevent crimes
6       and other wrongs when he could; a failure to perform the duty would give the criminal
        or other wrongdoer a right of action against the failed protector.

7

8   *Thomas*, 706 F.3d at 853.

9           UBS AG argues that plaintiffs "must bear the responsibility for their own actions" and "cannot

10  shift blame to UBS" in that plaintiffs failed to disclose and pay taxes on their foreign accounts. *See*

11  *Olenicoff*, 2012 WL 1192911, at *1 (plaintiff "may not avoid the consequences of his own plea by

12  getting UBS to indemnify him for his criminal acts"). UBS AG points to the absence of allegations that

13  plaintiffs misinterpreted or did not know of Line 7a.

14                              ***Unclean Hands***

15          Plaintiffs characterize UBS AG to assert an unclean hands defense which is inapplicable and a

16  matter of factual determination. Plaintiffs argue that the unclean hands doctrine does not apply because

17  it addresses plaintiffs' misconduct "which is unconnected with the matter in litigation" in that UBS AG

18  was not involved in DOJ actions against plaintiffs.

19          "It is one of the fundamental principles upon which equity jurisprudence is founded, that before

20  a complainant can have a standing in court he must first show that not only has he a good and

21  meritorious cause of action, but he must come into court with clean hands." *Keystone Driller Co. v.

22  General Excavator Co.*, 290 U.S. 240, 244, 54 S.Ct. 146 (1933).

23          Plaintiffs fail to establish that the unclean hands doctrine is at issue. UBS AG contends that

24  plaintiffs' own fraud bars their fraud claims. The gist of the fraud claims is that UBS AG caused

25  plaintiffs to commit tax fraud by cajoling plaintiffs into questionable investments and failing to disclose

26  plaintiffs' tax reporting obligations. Plaintiffs' failure to report their foreign accounts is tax fraud to

27  defeat their fraud claims, not unclean hands.

28                              ***Judicial Estoppel***

1    Plaintiffs further characterize UBS AG to apply judicial estoppel to bar the fraud claims.

2    Plaintiffs contend that their guilty pleas and voluntary disclosures should not be considered to analyze

3    the SAC's claims.

4    Judicial estoppel "precludes a party from gaining an advantage by taking one position, and then

5    seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers and Steamfitters*

6    *Local 343*, 94 F.3d 597, 600 (9th Cir. 1996).  The Ninth Circuit has explained the rationale of judicial

7    estoppel:

8    > The policies underlying preclusion of inconsistent positions are general considerations
     > of the orderly administration of justice and regard for the dignity of judicial proceedings.
9    > . . . Judicial estoppel is intended to protect against a litigant playing fast and loose with
     > the courts. . . . Because it is intended to protect the dignity of the judicial process, it is an
10   > equitable doctrine invoked by a court at its discretion.

11   *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2915 (1991).

12   The U.S. Supreme Court has further explained:  "[W]here a party assumes a certain position in

13   a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his

14   interests have changed, assume a contrary position, especially if it be to the prejudice of the party who

15   has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct.

16   555 (1895).

17   Similar to the unclean hands doctrine, plaintiffs fail to demonstrate UBS AG's invocation of

18   judicial estoppel.  In its reply papers, UBS AG notes it "did not expressly rely on this doctrine."

19   Plaintiffs' failure to report their foreign accounts is tax fraud to defeat their fraud claims.  UBS AG does

20   not rely on plaintiffs' inconsistent positions, especially given that SAC allegations that UBS AG duped

21   plaintiffs to commit tax fraud.  Plaintiffs' claims of reliance on UBS AG's advice contradicts their plea

22   agreements that they willfully filed false tax returns.

23   Plaintiffs' unclean hands and judicial estoppel points equate to unavailing straw men.

### *Fraud Elements – Justifiable Reliance*

25   UBS AG faults the SAC's failure to support fraud elements, in particular, justifiable reliance.

26   The elements of a California fraud claim are: (1) misrepresentation (false representation,

27   concealment or nondisclosure); (2) knowledge of the falsity (or "scienter"); (3) intent to defraud, i.e.,

28   to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal.4th

631, 638, 49 Cal.Rptr.2d 377 (1996).  The same elements comprise a cause of action for negligent

misrepresentation, except there is no requirement of intent to induce reliance.  *Caldo v. Owens-Illinois, Inc.*, 125 Cal.App.4th 513, 519, 23 Cal.Rtpr.3d 1 (2004).

"[T]o establish a cause of action for fraud a plaintiff must plead and prove in full, factually and specifically, all of the elements of the cause of action."  *Conrad v. Bank of America*, 45 Cal.App.4th 133, 156, 53 Cal.Rptr.2d 336 (1996).  There must be a showing "that the defendant thereby intended to induce the plaintiff to act to his detriment in reliance upon the false representation" and "that the plaintiff actually and justifiably relied upon the defendant's misrepresentation in acting to his detriment."  *Conrad*, 45 Cal.App.4th at 157, 53 Cal.Rptr.2d 336; *see Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) ("Both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance"); *J.A.O. Acquisition Corp. v. Stavitsky,* 8 N.Y.3d 144, 148, 831 N.Y.S.2d 364 (N.Y. 2007); *Lawyers Title Ins. Corp. v. Baik*, 147 Wash.2d 536, 624, 55 P.3d 619 (Wash. 2002).  "The absence of any one of these required elements will preclude recovery."  *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal.App.3d 1324, 1332, 231 Cal.Rptr. 355 (1986).

UBS AG faults the SAC's absence of facts to support plaintiffs' actual and justifiable reliance on UBS AG's misrepresentations or omissions given plaintiffs' obligation to report truthfully their income.  UBS AG notes that "Plaintiffs cannot allege reasonable reliance on advice from UBS which caused them to lie on their tax returns."  UBS AG argues that fraud claims based on an "omission" theory fail in that Line 7a seeks an unequivocal disclosure ("did you have a financial interest in or signature authority over a financial account . . . located in a foreign country?").  *See Browning v. C.I.R.*, 2011 WL 5289636, at *14 (U.S. Tax Ct. 2011) ("It is inconceivable that . . . petitioner, a college graduate with a successful business background, . . . could misinterpret" Line 7a).

UBS AG attacks an affirmatively misrepresented tax-reporting theory in that there is no justifiable reliance if a plaintiff unreasonably fails to conduct an independent inquiry that would have uncovered the truth or disregards known and obvious risks.  *See Cameron v. Cameron*, 88 Cal.App.2d 585, 594, 199 P.2d 443 (1948) ("If [one] becomes aware of facts that tend to arouse his suspicion, or if he has reason to believe that any representations made to him are false or only half true, it is his legal duty to complete his investigation and he has no right to rely on statements of the other contracting

13

party.”); *Mark Patterson, Inc. v. Bowie*, 237 A.D.2d 184, 654 N.Y.S.2d 769 (N.Y. App. Div. 1997) (“reliance is negated by the fact that plaintiff had independent access to this information”).  UBS AG contends that given clarity of disclosure required by IRS tax forms, plaintiffs could not have justifiably relied on UBS AG’s alleged statements suggesting otherwise.  UBS AG concludes that the simplicity of Line 7a renders inconceivable plaintiffs’ misinterpretation, “regardless of what UBS representative told or failed to tell Plaintiffs.”

Plaintiffs respond that the fraud claims “extend well beyond” tax advice and point to claims of improperly established shell corporations.  Plaintiffs claim they were induced “to invest and rely on UBS’s expertise” and give “unfettered control over Plaintiffs’ assets.”  Plaintiffs claim that nothing “suggests that Plaintiffs had any degree of sophistication or expertise over UBS.”

Despite plaintiffs’ characterizations of alleged fraud, the distilled allegations are that UBS AG made representations to induce plaintiffs to invest in foreign accounts which plaintiffs failed to report. The SAC lacks facts to support actual or justifiable reliance given Line 7a clear disclosure requirements. UBS AG’s “purported expertise and knowledge” are insufficient in that the SAC alleges facts to no less than arouse suspicion that plaintiffs needed to address reporting their foreign accounts.  The SAC’s clear import is that UBS AG provided investing services, not legal or tax advice, to support reliance.

### *Constructive Fraud*

The SAC’s (second) constructive fraud claim is premised on “a confidential and fiduciary relationship” among UBS AG and plaintiffs.  In *Salahutdin v. Valley of California, Inc.,* 24 Cal.App.4th 555, 562, 29 Cal.Rptr.2d 463 (1994), the California Court of Appeal explained constructive fraud:

> Constructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship. . . . [A]s a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent. Most acts by an agent in breach of his fiduciary duties constitute constructive fraud. The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud. Also, a careless misstatement may constitute constructive fraud even though there is no fraudulent intent. (Citation and internal punctuation omitted).

“California courts have not extended the ‘special relationship’ doctrine to include ordinary commercial contractual relationships.” *Martin v. U-Haul Co. Of Fresno,* 204 Cal.App.3d 396, 412, 251

Cal.Rptr. 17 (1988) (citations omitted).  The "relationship between a bank and its depositor is not fiduciary in character." *Das v. Bank of America, N.A.*, 186 Cal.App.4th 727, 741, 112 Cal.Rptr.3d 439 (2010).  "[U]nder ordinary circumstances the relationship between a bank and its depositor is that of debtor-creditor, and is not a fiduciary one." *Lawrence v. Bank of America*, 163 Cal.App.3d 431, 437, 209 Cal.Rptr. 541 (1985); *see Thomas*, 706 F.3d at 853 (a "bank is not a fiduciary of its depositors.  It is merely a debtor"); *Bennice v. Lakeshore Sav. & Loan Ass'n*, 254 A.D.2d 731, 732, 677 N.Y.S.2d 842 (1998) ("Absent the existence of a special relationship of trust and confidence, a bank has no duty to inform a customer or depositor of the tax consequences of a transaction"); *Tokarz v. Frontier Federal Sav. and Loan Ass'n*, 33 Wash. App. 456, 459, 656 P.2d 1089 (1982); *Jockusch v. Towsey*, 51 Tex. 129, 131 (1879).

This Court's prior order noted the absence of "facts to support fiduciary-based claims and dismissed with prejudice "claims arising from an alleged fiduciary relationship among UBS AG and plaintiffs." Based on the parties' stipulation, this Court dismissed the SAC's (fourth) breach of fiduciary duty claim.  The complaint lacks facts to support a confidential or fiduciary duty, regardless of dismissal of the breach of fiduciary duty claim.  Plaintiffs offer no meaningful opposition to dismissal of the constructive fraud claim.  The SAC depicts a banking investment relationship among UBS AG and plaintiffs, not a fiduciary or confidential relationship.

In sum, the SAC fails to support the fraud claims which are subject to dismissal.

**Malpractice**

The SAC's (seventh) malpractice claim is premised on allegations that defendants:

1.   Charged "unreasonable, excessive, and unethical fees";

2.   Failed "to disclose and comply with the QI Agreement and other disclosure and tax law requirements";

3.   Implemented a scheme to manipulate plaintiffs "into keeping their assets with UBS AG and held by specific trusts";

4.   Advised plaintiffs "that the transactions were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations";

5.   Failed to advise plaintiffs that defendants "were not properly licensed to provide banking

15

services, offer investment advice, manage funds and solicit and execute the purchase and sale of securities to and for U.S. citizens";

6.      Recommended and assisted plaintiffs "in the formation of unnecessary business entities and incurring unnecessary fees, penalties and criminal investigations";

7.      Transferred assets to "shell" entities to create unnecessary fees;

8.      Promoted and sold "unregistered and ineffective tax shelters";

9.      Failed "to ensure that the advised transaction complied with applicable federal rules and regulations";

10.    Violated "professional rules of conduct"; and

11.    Provided personal and erroneous financial information to third parties.

The SAC's (fourteenth) breach of confidentiality claim alleges that defendants violated Swiss law by "revealing a customer's private information to any third party" to prevent plaintiffs "to apply for voluntary disclosure being afforded by the IRS."

UBS AG faults the absence of facts to support elements of the malpractice and breach of confidentiality claims.

### *Malpractice Elements*

The elements of a malpractice claim are (1) the professional's duty to use such skill, prudence, and diligence as members of his/her profession commonly possess and exercise; (2) breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the negligence. *Coscia v. McKenna & Cuneo,* 25 Cal.4th 1194, 1199, 108 Cal.Rptr.2d 471 (2001). "A key element of any action for professional malpractice is the establishment of a duty by the professional to the claimant. Absent duty there can be no breach and no negligence." *Moore v. Anderson Zeigler Disharoon Gallagher & Gray,* 109 Cal.App.4th 1287, 1294, 135 Cal.Rptr.2d 888 (2003).

### *Failure To Disclose UBS AG's QI Agreement Requirements*

Plaintiffs place on UBS AG "a duty to disclose to its customers the requirement that it either disclose potential confidential information of its customers to the IRS or otherwise withhold a percentage of profits each year."

UBS AG argues that the malpractice claim turns on whether plaintiffs' relationship with UBS AG triggered UBS AG's duty to disclose QI Agreement requirements. UBS AG notes that the QI Agreement  requirements ran between UBS AG and the IRS, not plaintiffs, and fail to invoke UBS AG duties to plaintiffs to provide tax advice or IRS disclosure requirements under the QI Agreement. *See Thomas v. UBS AG*, 2012 WL 2396866, at * 5 (N.D. Ill. 2012) ("Plaintiffs' allegation that UBS had a duty to Plaintiffs is not plausible").

UBS AG further faults the absence of facts to support proximate cause of damages arising from UBS AG's failure to disclose UBS AG's QI Agreement requirements. UBS AG points to the following from *Thomas*, 2012 WL 2396866, at *6:

> With respect to causation, Plaintiffs allege that "UBS's failure to meet the applicable standard of care" caused them to fail to "disclose their UBS Swiss Accounts on their U.S. tax returns." ( Id. ¶ 78.) But Plaintiffs fail to allege how UBS's alleged negligence caused Plaintiffs to fail to disclose their foreign accounts on their U.S. tax returns.

The SAC lacks facts that UBS AG's breach of an actionable duty caused plaintiffs damage regarding plaintiffs' tax reporting obligations. The SAC fails to allege facts to invoke UBS AG's duty running from its QI Agreement obligations owed to the IRS. The SAC lacks facts to connect plaintiffs' alleged damages to UBS AG's negligence to induce plaintiffs' failure to report foreign accounts. Plaintiffs' tax penalties arose from their failure to disclose their foreign accounts. Plaintiffs' claims of lost "investment and tax savings opportunities" are unavailing in absence of sufficient supporting facts.

### *Confidentiality*

Turning to UBS AG's release of plaintiffs' names to the IRS, UBS AG argues that such alleged breach of confidentiality caused no damages to plaintiffs given plaintiffs' failure to complete truthful tax returns. UBS AG notes that plaintiffs cannot fault UBS AG "for revealing confidential information where the information in question revealed that Plaintiffs were perpetrating knowing frauds on the U.S. government."

Plaintiffs respond that "UBS's breach of its own regulations and Swiss laws, coupled with its failure to timely advise Plaintiffs of the Voluntary Disclosure problem, resulted in greater penalties than the respective Plaintiffs should have suffered."

Plaintiffs fail to support breach of confidentiality claims. The gist of the confidentiality claim

17

1    is that UBS AG was obligated to decrease plaintiffs' penalties arising from plaintiffs' own tax fraud.

2    Plaintiffs provide neither supporting facts nor law for such notion.

3                                    ***Account Management***

4          Turning from disclosure of tax reporting and plaintiffs' identities, the remainder of the

5    malpractice claim focuses on management of plaintiffs' accounts, for instance, placing plaintiffs in

6    improper accounts or trusts.  UBS AG contends that this Court's prior order effectively dismissed such

7    claims.  UBS AG is correct that the order dismissed account management claims based on fiduciary

8    breaches.  However, the order did not dismiss account management claims under a malpractice or

9    negligence theory and granted leave to amend such claims.  UBS AG fails to challenge meaningfully the

10   SAC's amended account management claims based on a malpractice or negligence theory.  As such,

11   negligence claims based on account management and related services survive to the extent not based on

12   tax reporting, tax compliance or confidentiality allegations.

13                                    **RICO**[6]

14         The SAC's (fifth) RICO claim alleges defendants' violation of 18 U.S.C. § 1962(c) ("section

15   1962(c)") based on predicate acts of:

16         1.    Embezzlement and bribery "for setting up illegal and improper trusts";

17         2.    Embezzlement "for false annual billings for 'legal services' not provided and for

18               arbitrarily freezing and then liquidating" Mr. Ginzburg's account, and charging "an

19               unauthorized $565,000 'sales tax'"; and

20         3.    "Fraudulent misrepresentation and concealment . . . relating to fund management, tax

21               withholding and/or tax from provision, tax legalities, liabilities, and filing requirements,

22               misappropriation of funds, and true use of assets."

23         The SAC's (sixth) RICO conspiracy claim alleges that "Defendants unlawfully . . . conspired .

24   . . to conduct and participate . . . in the affairs fo UBS AG and its affiliated professional service providers

25   . . . through a pattern of racketeering, all in violation of 18 U.S.C. § 1962(d) [("section 1962(d)")]."  The

26   section 1962(d) conspiracy claim relies on the same predicate acts as the section 1963(c) claim.

27   _____

28         [6]     RICO refers to the Racketeer and Corrupt Practices Act ("RICO"), 18 U.S.C. §§ 1961, et seq.

1    Section 1962(c) and (d) provide:

2         (c) It shall be unlawful for any person employed by or associated with any
     enterprise engaged in, or the activities of which affect, interstate or foreign commerce,
3    to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs
     through a pattern of racketeering activity or collection of unlawful debt.

4

5         (d) It shall be unlawful for any person to conspire to violate any of the provisions
     of subsection (a), (b), or (c) of this section.

6

7    A violation of § 1962(c) "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of

8    racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim."

9    *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275 (1985).

10   Subsection (5) of 18 U.S.C. § 1961("section 1961") defines "pattern of racketeering activity" to

11   require "at least two acts of racketeering activity, one of which occurred after the effective date of this

12   chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the

13   commission of a prior act of racketeering activity."  Section 1961"does not so much define a pattern of

14   racketeering activity as state a minimum necessary condition for the existence of such a pattern."  *H.J.,*

15   *Inc. v. Northwest Bell Telephone Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893 (1989).  Section 1961(5) "says

16   of the phrase 'pattern of racketeering activity' only that it 'requires at least two acts of racketeering

17   activity, one of which occurred after [October 15, 1970,] and the last of which occurred within ten years

18   (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.' It

19   thus places an outer limit on the concept of a pattern of racketeering activity that is broad indeed."  *H.J.,*

20   *Inc.*, 492 U.S. at 237, 109 S.Ct. 2893.   "Section 1961(5) concerns only the minimum *number* of

21   predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern

22   *beyond* simply the number of predicate acts involved."  *H.J., Inc.*, 492 U.S. at 238, 109 S.Ct. at 2900

23   (italics in original).

24   The Ninth Circuit applies F.R.Civ.P. 9(b) particularity requirements to RICO claims under 18

25   U.S.C. § 1962.  *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989); *Alan Neuman*

26   *Prods., Inc. v. Albright*, 862 F.2d 1388, 1392-93  (9th Cir. 1988) ("The allegations of predicate acts in

27   the complaint concerning those elements of RICO are entirely general; no specifics of time, place, or

28   nature of the alleged communications are pleaded. This is a fatal defect under Fed.R.Civ.P. 9(b), which

1  requires that circumstances constituting fraud be stated with particularity."); *Schreiber Distrib. Co. v.*

2  *Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986) ("We have interpreted Rule 9(b) to mean

3  that the pleader must state the time, place, and specific content of the false representations as well as the

4  identities of the parties to the misrepresentation.")

5      "The mere assertion of a RICO claim consequently has an almost inevitable stigmatizing effect

6  on those named as defendants. In fairness to innocent parties, courts should strive to flush out frivolous

7  RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st

8  Cir. 1990).

9      "The particularity requirements of Rule 9(b) apply to allegations of mail fraud, 18 U.S.C. §

10  1341, and wire fraud, 18 U.S.C. § 1343, when used as predicate acts for a RICO claim." *Murr*

11  *Plumbing, Inc. v. Scherer Bros. Financial Services Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995).

12      UBS AG faults the SAC's failure to allege "predicate acts as required for their RICO claims."

13  UBS AG argues that a RICO claim based on fraud or concealment as predicate acts fails in the absence

14  of "the particular contents of the purported fraudulent representations sufficient to constitute a pattern

15  of racketeering activity." UBS AG contends that embezzlement and bribery allegations fail in the

16  absence of "specific instances of illegal activity" and reliance on vague allegations of illegal and

17  improper trusts.

18      UBS AG faults the RICO conspiracy claim's absence of "allegations of coordination or

19  organization among UBS AG and other Defendants who are alleged to have 'continued' some sort of

20  scheme during the years after Plaintiffs closed their UBS accounts in June 2005."

21      Plaintiffs respond that the RICO claims survive based on SAC allegations that UBS AG

22  participated in continued activity to defraud the IRS and customers, to permit bribes and kickbacks, and

23  to charge excessive fees.

24      The FAC's RICO claims fail in absence of particularity to satisfy F.R.Civ.P. 9(b). The SAC as

25  a whole lacks facts to support embezzlement, bribery and fraud to support RICO claims. The SAC

26  alleges no more than general predicate acts without necessary specifics. The gravity of RICO claims

27  requires the SAC to plead sufficient specificity, and the SAC fails to do so.

28      **Unfair Business Practices**

1    The SAC's (eighth through eleventh) claims allege unfair business practices under California,

2    Texas, New York and Washington statutes based on defendants' embezzlement, securities fraud and

3    fraudulent misrepresentation and concealment "relating to fund management, tax legalities, liabilities,

4    and filing requirements, privacy, quality of securities, true price of securities, and true use assets."

5    UBS AG challenges the unfair business practices claims as conclusory and failing to demonstrate

6    harm caused by UBS AG.

7    ***California***

8    The SAC's eighth claim proceeds under California's Unfair Competition Law ("UCL"), Cal. Bus.

9    & Prof. Code, §§ 17200, et al.  "Unfair competition is defined to include 'unlawful, unfair or fraudulent

10   business practice and unfair, deceptive, untrue or misleading advertising.'" *Blank v. Kirwan*, 39 Cal.3d

11   311, 329, 216 Cal.Rptr. 718 (1985) (quoting Cal. Bus. & Prof. Code, § 17200).  The UCL establishes

12   three varieties of unfair competition – "acts or practices which are unlawful, or unfair, or fraudulent."

13   *Shvarts v. Budget Group, Inc.*, 81 Cal.App.4th 1153, 1157, 97 Cal.Rptr.2d 722 (2000).  An "unlawful

14   business activity" includes anything that can properly be called a business practice and that at the same

15   time is forbidden by law. *Blank*, 39 Cal.3d at 329, 216 Cal.Rptr. 718 (citing *People v. McKale,* 25 Cal.3d

16   626, 631-632, 159 Cal.Rptr. 811, 602 P.2d 731 (1979)).  "A business practice is 'unlawful' if it is

17   'forbidden by law.'"  *Walker v. Countrywide Home Loans, Inc.*, 98 Cal.App.4th 1158, 1169, 121

18   Cal.Rptr.2d 79 (2002) (quoting *Farmers Ins. Exchange v. Superior Court,* 2 Cal.4th 377, 383, 6

19   Cal.Rptr.2d 487 (1992)).

20   The UCL prohibits "unlawful" practices "forbidden by law, be it civil or criminal, federal, state,

21   or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court*, 27 Cal.App.4th 832,

22   838, 33 Cal.Rptr.2d 548 (1999).  The UCL "thus creates an independent action when a business practice

23   violates some other law."  *Walker*, 98 Cal.App.4th at 1169, 121 Cal.Rptr.2d 79.  According to the

24   California Supreme Court, the UCL "borrows" violations of other laws and treats them as unlawful

25   practices independently actionable under the UCL.  *Farmers Ins.,* 2 Cal.4th at 383, 6 Cal.Rptr.2d 487.

26   A fellow district court has explained the borrowing of a violation of law other than the UCL:

27        To state a claim for an "unlawful" business practice under the UCL, a plaintiff
          must assert the violation of any other law. *Cel-Tech Commc'ns, Inc. v. Los Angeles
28        Cellular Telephone Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999)

1    (stating, "By proscribing 'any unlawful' business practice, section 17200 'borrows'
2    violations of other law and treats them as unlawful practices that the unfair competition
     law makes independently actionable.") (citation omitted). Where a plaintiff cannot state
3    a claim under the "borrowed" law, she cannot state a UCL claim either. *See, e.g., Smith
     v. State Farm Mutual Automobile Ins. Co.*, 93 Cal.App.4th 700, 718, 113 Cal.Rptr.2d
4    399 (2001). Here, Plaintiff has predicated her "unlawful" business practices claim on her
     TILA claim. However, as discussed above, Plaintiff's attempt to state a claim under TILA
5    has failed. Accordingly, Plaintiff has stated no "unlawful" UCL claim.

6    *Rubio v. Capital One Bank*, 572 F.Supp.2d 1157, 1168 (C.D. Cal. 2008).

7              "Unfair" under the UCL "means conduct that threatens an incipient violation of an antitrust law,

8    or violates the policy or spirit of one of those laws because its effects are comparable to or the same as

9    a violation of the law, or otherwise significantly threatens or harms competition." *Cal-Tech

10   Communications, Inc. v. Los Angeles Cellular Telephone*, 20 Cal.4th 163,187, 83 Cal.Rptr.2d 548

11   (1999). A business practice is unfair when it "offends an established public policy or when the practice

12   is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Podolsky v.

13   First Healthcare Corp.*, 50 Cal.App.4th 632, 647, 58 Cal.Rptr.2d 89 (1996) (internal quotations and

14   citations omitted). The "unfairness" prong of the UCL "does not give the courts a general license to

15   review the fairness of contracts." *Samura v. Kaiser Found. Health Plan*, 17 Cal.App.4th 1284, 1299 &

16   n. 6, 22 Cal.Rptr.2d 20 (1993).

17             The "fraudulent" prong under the UCL requires a plaintiff to "show deception to some members

18   of the public, or harm to the public interest," *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.,*

19   178 F.Supp.2d 1099, 1121 (C.D. Ca. 2001), or to allege that "members of the public are likely to be

20   deceived," *Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144, 1167, 93 Cal.Rptr.2d 439 (2000); *Medical

21   Instrument Development Laboratories v. Alcon Laboratories*, 2005 WL 1926673, at *5 (N.D. Cal. 2005).

22   A UCL "plaintiff need not show that he or others were actually deceived or confused by the conduct or

23   business practice in question." *Schnall*, 78 Cal.App.4th at 1167, 93 Cal.Rptr.2d 439.

24             "A plaintiff alleging unfair business practices under these statutes [UCL] must state with

25   reasonable particularity the facts supporting the statutory elements of the violation." *Khoury v. Maly's

26   of California, Inc.*, 14 Cal.App.4th 612, 619, 17 Cal.Rptr.2d 708 (1993).

27                                                     ***Texas***

28             The SAC's ninth claim proceeds under the Texas Deceptive Trade Practices and Consumer

                                                         22

Protection Act ("Texas Act"), Tex. Bus. & Com. Code, §§ 17.41, et al.

The Texas Act renders unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code, § 17.46. Under the Texas Act, a consumer may pursue an action when "a false, misleading, or deceptive act or practice" is "relied on by a consumer to the consumer's detriment" and is an "unconscionable action or course of action." Tex. Bus. & Com. Code, § 17.50(a). The Texas Act defines an "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code, § 17.45(5).

### New York

The SAC's tenth claim proceeds under New York General Business Law section 349 ("section 349"), which renders unlawful "[d]eceptive acts or practices in the conduct or any business, trade or commerce or in the furnishing or any service in this state." "A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892 (2000).

### Washington

The SAC's eleventh claim proceeds under the Washington Consumer Protection Act ("Washington CPA"), Rev.Code.Wash., § 19.86.020, et al. "[T]o state a claim for relief under the CPA, plaintiffs must allege that acts by defendant were unfair or deceptive, occurred in the course of trade or commerce, affected the public interest, and caused injury to plaintiffs' business or property." *Segal Co. (Eastern States), Inc. v. Amazon.Com*, 280 F.Supp.2d 1229, 1232 (W.D. Wash. 2003).

UBS AG argues that the SAC's conclusory allegations as to unfair business practices (premised on embezzlement, fraudulent concealment and securities fraud) are insufficient and fail to satisfy pleading requirements. UBS AG argues that the SAC lacks details of UBS AG's accomplishment of embezzlement, fraudulent concealment and securities fraud and points to this Court's prior dismissal with prejudice of securities fraud claims.

Plaintiffs respond that the SAC "read as a whole" states claims for unfair business practices given allegations that UBS AG committed fraud, negligence and breach of fiduciary duties, evaded U.S.

Treasury rules and regulations, "took advantage of Plaintiffs' lack of knowledge," and "deceived Plaintiffs into believing that their accounts were being handled and that they would receive a benefit."

The only surviving claim to support unfair business practices is negligent account management. The gist of the negligent account management claims is that UBS AG created for and placed plaintiffs in investment vehicles which were unsuitable for plaintiffs. Negligent account management sounds in tort, not unlawful business practice, and as discussed below was particular to plaintiffs, not the general public.

### *Public Harm*

UBS AG further challenges the SAC's absence of allegations to support harm to members of the public. *See New York Univ. v Continental Ins. Co.*, 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283 (1995) (defendant's acts or practices must have a broad impact on consumers at large; private contract disputes unique to the parties do not fall "within the ambit of the statute"); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 784, 719 P.2d 531 (1986) (Washington CPA requires "a showing that the public interest would be served by each private plaintiff's lawsuit"). UBS AG notes that unfair business practices statutes are not used to redress plaintiffs' tort and contract claims in that to allow such use would be "an all-purpose substitute for a tort or contract action, something the Legislature never intended." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1151, 131 Cal.Rptr.2d 29 (2003).

Plaintiffs respond that under the UCL, a plaintiff "need only show that members of the public are likely to be deceived." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1267, 10 Cal.Rptr.2d 538 (1992) (internal quotation omitted). Plaintiffs claim that Texas and New York laws require no pleading of public harm. Plaintiffs note that the multiple plaintiffs indicates "this deception was not an isolated incident." Plaintiffs continue that UBS AG's "business practice is injurious to the public interest because it violates Federal RICO laws, injured multiple parties as evidence by the nine Plaintiffs . . . ,and had the capacity to injury many others."

Plaintiffs attempt to use the unfair business practices laws as a substitute for a tort action. Plaintiffs fails to substantiate such use, given the limited survival of a negligent account management claim. Moreover, the SAC's pleads no facts that the public at large was subject to UBS AG's alleged

1  wrongdoing in that the SAC alleges that UBS AG targeted limited, exclusive wealthy clients with need

2  to avoid large taxes.  The unfair business practices claims fail.

3  <center>**Breach Of Contract**</center>

4       The SAC's (twelfth) breach of contract claim alleges that plaintiffs entered into "oral and/or

5  written contracts" to "maintain accounts or open new accounts with UBS AG," which agreed to provide

6  "professionally competent investment and securities advisory and execution services, tax and legal

7  advice and service, and accounting services."  The breach of contract claim alleges material breach in

8  that defendants:

9       1.    Provided plaintiffs with advice and services "in furtherance of the conduct described

10            above";

11      2.    Charged "fees, costs, and expenses that were not chargeable or agreed to by each

12            Plaintiff";

13      3.    Liquidated Mr. Ginzburg's funds without "properly evaluating the securities held and the

14            negative impacts such an unauthorized liquidation would have";

15      4.    Allowed a $565,000 "sales tax";

16      5.    Caused Mr. Roberts, Mr. Ginzburg and Mr. Chernick "to waste money on ill-conceived

17            and illegal trusts" and on "annual services";

18      6.    Caused creation of a third-party trust without authorization of Mr. Chernick, Simba and

19            Shumba;

20      7.    Failed "to prevent the losses incurred as penalties instead of advising Plaintiffs that the

21            recommended program was in fact illegal . . . and that Plaintiffs should report their

22            accounts, and take advantage of the Voluntary Disclosure program"; and

23      8.    Disclosed "each Plaintiff's name to the DOJ prematurely."

24       UBS AG faults the SAC's absence of facts to support breach of contract elements.

25       "The standard elements of a claim for breach of contract are: (1) the contract, (2) plaintiff's

26  performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff

27  therefrom."  *Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal.App.4th 1171, 1178, 80

28  Cal.Rptr.3d 6 (2008).  "To form a contract, an 'offer must be sufficiently definite . . . that the

<center>25</center>

1   performance promised is reasonably certain.'"   *Alexander v. Codemasters Group Limited*, 104

2   Cal.App.4th 129, 141. 127 Cal.Rptr.2d 145 (2002).

3        Essential elements to contract existence are: (1) "[p]arties capable of contracting;" (2) "[t]heir

4   consent;" (3) a "lawful object;" and (4) a "sufficient cause or consideration."  Cal. Civ. Code, § 1550.

5        "A written contract may be pleaded either by its terms  – set out verbatim in the complaint or a

6   copy of the contract attached to the complaint and incorporated therein by reference – or by its legal

7   effect. In order to plead a contract by its legal effect, plaintiff must allege the substance of its relevant

8   terms." *McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457, 1489, 49 Cal.Rptr.3d 227 (2006)

9   (internal citations omitted).

10       UBS AG characterizes the SAC "as too vague and indefinite, and therefore unenforceable, for

11  plaintiff's failure to allege, in nonconclusory language, as required, the essential terms of the parties'

12  purported contract, including the specific provisions of the contract upon which liability is predicated."

13  *Sud v. Sud*, 211 A.D.2d 423, 621 N.Y.S.2d 37, 38 (App. Div. 1995); *Bissessur v. Indiana University Bd.*

14  *of Trustees*, 581 F.3d 599, 603 (7th Cir. 2009) ("A plaintiff may not escape dismissal on a contract claim,

15  for example, by stating that he had a contract with the defendant, gave the defendant consideration, and

16  the defendant breached the contract. What was the contract? The promises made? The consideration?

17  The nature of the breach?").  UBS AG faults the purported breaches' lack of connection to "specific

18  contractual provisions between any of the plaintiffs and UBS."  UBS AG characterizes the breach of

19  contract claim "to assert the same common law breach of duty claims against UBS again."

20       Plaintiffs respond that "a contract existed separately between each of the Plaintiffs and UBS" and

21  breaches included charging fees not agreed to, unauthorized liquidation, and failure to release funds and

22  "to provide professionally competent advice."

23       UBS AG is correct that the SAC's purported breach of contract claims are vague and conclusory.

24  The FAC fails to identify sufficiently precise contract terms, their breach, who breached them, and how

25  they were breached.  The SAC fails to identify sufficiently plaintiffs' consideration to support breach

26  of contract claims.  At its essence, the breach of contract claim alleges account management negligence,

27  and plaintiffs are able to pursue such claims and remedies through their limited surviving negligence

28  claim.

1   / / /

2   **<u>Conversion</u>**

3   The SAC's (thirteenth) conversion claim alleges that UBS AG:

4   1.      Charged Mr. Eisenberg "twice the rate he was supposed to be charged as evidenced by

5          some statement charges"; and

6   2.      Converted from Mr. Ginzburg "$565,000 under the guise of 'sales tax' at the time they

7          arbitrarily liquidated his account in 2009."

8   "Conversion is the wrongful exercise of dominion over the property of another." *Oakdale*

9   *Village Group v. Fong*, 43 Cal.App.4th 539, 543, 50 Cal.Rptr.2d 810 (1996). "To establish conversion,

10  a plaintiff must show: (1) the plaintiff's ownership or right to possession to the property at the time of

11  conversion; (2) the defendant's conversion by a wrongful act; and (3) damages." *Oakdale Village Group*,

12  43 Cal.App.4th at 543-544, 50 Cal.Rptr.2d 810. "Money cannot be the subject of a cause of action for

13  conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum

14  of money to be paid to another and fails to make the payment." *McKell v. Washington Mut., Inc.*, 142

15  Cal.App.4th 1457, 1491, 49 Cal.Rptr.3d 227 (2006). "A specific and identified amount of money can

16  form the basis of a conversion claim, but when the money is not identified and not specific, the action

17  is to be considered as one upon contract or for debt and not for conversion." *Ross v. U.S. Bank Nat.*

18  *Ass'n*, 542 F.Supp.2d 1014, 1024 (N.D. Cal. 2008) (internal quotation omitted).

19  UBS AG notes that the SAC alleges a specific $565,000 sum as to Mr. Ginzburg but fails to

20  allege that UBS AG applied the money for its use or even retained the money. UBS AG faults the

21  absence of SAC allegations to identify as to other plaintiffs a specific sum allegedly converted.

22  The SAC lacks sufficient specificity to support a conversion claim, except as to Mr. Ginzburg's

23  $565,000. Other alleged funds converted are not a specific, identifiable sum to warrant dismissal of the

24  conversion claim, except as to Mr. Ginzburg's $565,000. Moreover, the conversion claim seeks relief

25  available from the limited account management negligence claim.

26  **<u>Declaratory Relief</u>**

27  The SAC's (fifteen) declaratory relief claim appears to seek this Court's declaration that

28  defendants "are legally responsible" for:

1      1.      Interest and/or tax penalties assessed by the IRS;

2      2.      Plaintiffs' professional fees and costs in connection with investigations and audits by tax

3              authorities; and

4      3.      Professional fees and expenses incurred "on account of Defendants' violations of law and

5              other actionable conduct."

6          UBS AG challenges availability of declaratory relief in the absence of a "substantive claim"

7      alleged in the SAC.

8          The Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202, provides in pertinent part:

9              In a case of actual controversy within its jurisdiction . . . any court of the United
       States, upon the filing of an appropriate pleading, may declare the rights and other legal

10     relations of any interested party seeking such declaration, whether or not further relief
       is or could be sought.  Any such declaration shall have the force and effect of a final

11     judgment or decree and shall be reviewable as such.

12     28 U.S.C. §2201(a).

13         The DJA's operation "is procedural only."  *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*,

14     300 U.S. 227, 240, 57 S.Ct. 461, 463 (1937).  "A declaratory judgment is not a theory of recovery."

15     *Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 775 (1st Cir. 1994).  The DJA

16     "merely offers an *additional remedy* to litigants."  *Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 21

17     (2nd Cir. 1997) (italics in original).  A DJA action requires a district court to "inquire whether there is

18     a case of actual controversy within its jurisdiction."  *American States Ins. Co. v. Kearns*, 15 F.3d 142,

19     143 (9th Cir. 1994).

20         Declaratory relief is appropriate "(1) when the judgment will serve a useful purpose in clarifying

21     and settling the legal relations in issue, and (2) when it will terminate and afford relief from the

22     uncertainty, insecurity, and controversy giving rise to the proceeding."  *Bilbrey by Bilbrey v. Brown*, 738

23     F.2d 1462, 1470 (9th Cir.1984).

24         As to a controversy to invoke declaratory relief, the question is whether there is a "substantial

25     controversy, between parties having adverse legal rights, or sufficient immediacy and reality to warrant

26     the issuance of a declaratory judgment."  *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270,

27     273, 61 S.Ct. 510, 512 (1941).  The U.S. Supreme Court has further explained:

28         A justiciable controversy is thus distinguished from a difference or dispute of a

28

1
2
3

hypothetical or abstract character; from one that is academic or moot. . . . The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

4   *Haworth*, 300 U.S. at 240-241, 57 S.Ct. at 464 (citations omitted).

5        A declaratory relief action "brings to the present a litigable controversy, which otherwise might

6   only be tried in the future." *Societe de Conditionnement v. Hunter Eng. Co., Inc.*, 655 F.2d 938, 943 (9th

7   Cir. 1981).   As an equitable remedy, declaratory relief is "dependent upon a substantive basis for

8   liability" and has "no separate viability" if all other causes of action are barred.  *Glue-Fold, Inc. v.*

9   *Slautterback Corp.*, 82 Cal.App.4th 1018, 1023, n. 3, 98 Cal.Rptr.2d 661 (2000).

10       The SAC fails to support a declaratory relief claim given dismissal of other claims subject to

11  UBS AG's motion to dismiss.  The SAC fails to substantiate an independent claim for declaratory relief,

12  and such claim is subject to dismissal, despite survival of the limited negligent account management and

13  conversion claims.

14                              **CONCLUSION AND ORDER**

15       For the reasons discussed above, this Court:

16       1.    DISMISSES with prejudice the SAC's (first) fraudulent misrepresentation and

17             concealment, (second) constructive fraud, and (third) negligent misrepresentation claims;

18       2.    DISMISSES with prejudice the SAC's (fifth and sixth) RICO claims;

19       3.    DISMISSES with prejudice the SAC's (seventh) professional malpractice claim to extent

20             based on disclosure of tax reporting requirements and plaintiffs' identities but DENIES

21             dismissal of the professional malpractice claim to the extent based on management of

22             plaintiffs' accounts;

23       4.    DISMISSES with prejudice the SAC's (eighth through eleventh) unfair business law

24             claims;

25       5.    DISMISSES with prejudice the SAC's (twelfth) breach of contract claim;

26       6.    DENIES dismissal of the SAC's (thirteenth) conversion claim as to only Mr. Ginzburg's

27             $565,000 but otherwise DISMISSES the conversion claim with prejudice;

28       7.    DISMISSES with prejudice the SAC's (fourteenth) breach of confidentiality claims;

1    8.    DISMISSES with prejudice the SAC's (fifteenth) declaratory relief claim;

2    9.    ORDERS UBS AG, no later than May 2, 2013, to file an F.R.Civ.P. 7(a)(2) answer  to

3          the SAC.

4          To reiterate, the claims remaining against UBS AG are limited to negligent management of

5    plaintiffs' accounts and conversion of Mr. Ginzburg's $565,000.

6          IT IS SO ORDERED.

7    **Dated:    April 11, 2013           /s/  Lawrence J. O'Neill**
                                    UNITED STATES DISTRICT JUDGE